# JUNE TERM, 1899.*

## PEOPLE *v.* McARRON.

1. JURY—CHALLENGE TO ARRAY—WAIVER.

    A challenge to the array of jurors upon the ground that the venire was issued before the proceedings were signed by one of the officers who participated in the drawing was properly overruled, where counsel purposely withheld it until after a jury, with which they professed to be satisfied, was sworn in the case.

2. CRIMINAL LAW—INFORMATION—MURDER AND MANSLAUGHTER.

    Under an information charging murder, respondent may be convicted of manslaughter, although he was previously tried for murder under the same information, and the jury were dismissed before verdict.

3. SAME—STATUTES—SUFFICIENT COMPLIANCE.

    Under 2 How. Stat. § 9527, providing that an information for manslaughter shall be sufficient if it aver that "the defendant did kill and slay the deceased," an information is good which charges that defendant did "kill and murder" the deceased.

4. SAME—EVIDENCE—RES GESTÆ.

    Upon a prosecution for manslaughter, the people claimed that several boys had been annoying respondent's mother, and that he, hearing a remark by one of them, rushed out, and, disregarding decedent's protest that he was innocent, struck him a blow which caused his death. Respondent denied that he had any altercation with or struck decedent. *Held*, that it was competent for one who heard respondent's mother tell him to "order them out; make them go away," to testify to the fact, although she was unable to connect it with the exact time of the claimed assault, where the connection was shown by other witnesses.

5. SAME.

    Evidence that respondent's mother said to him, immediately after the assault, "Now, see what you have done," was properly received as part of the *res gestæ*.

---

* Continued from Vol. 120.

6. SAME.

Such declaration was also admissible to explain a remark, "I will show him," claimed to have been made by respondent in reply.

7. WITNESSES—CREDIBILITY—CROSS-EXAMINATION OF CHILDREN—FAMILY RELATIONS.

It was within the discretion of the trial court to refuse to permit counsel to attack the credibility of a 10-year-old witness by questions concerning her knowledge as to when a certain woman, who she had testified was the only mother she had ever known, first became acquainted with her father, and as to their subsequent relations.

8. SAME—CHARACTER OF WITNESS—WANT OF CHASTITY.

It was also within the discretion of the court to refuse to permit the woman, who was also a witness, to be cross-examined as to unchaste conduct covering a period of 15 years before the trial.

9. SAME—IMPEACHMENT—TESTIMONY ON EXAMINATION—RIGHT TO HAVE SAME READ.

A witness on a criminal trial cannot be cross-examined, for the purpose of impeachment, as to his testimony in justice's court upon the examination, without first reading to him his deposition as returned.

10. SAME.

But, if such deposition were read, he might be asked concerning statements claimed to have been made by him in justice's court, but not included in the deposition.

11. SAME—HARMLESS RULING.

The exclusion of a question, asked on cross-examination for the purpose of impeaching the witness by bringing out his contradictory testimony upon a former examination, is harmless, where the former testimony is afterwards read in evidence.

12. SAME.

Respondent cannot complain of the admission on redirect examination of statements in substantial repetition of those brought out upon cross-examination.

13. SAME—FAILURE TO PRODUCE.

It is not error for the prosecution, on a trial for homicide, to fail to call as witnesses the persons who carried home the body of deceased, where it does not appear that they know anything of the *res gestæ*, and an offer is made to produce them.

14. SAME.

Respondent cannot complain of a question the answer to which was favorable to himself.

15. SAME.

Respondent's witness having been permitted to show that at the coroner's inquest, whereon his testimony was claimed to differ from that given at the trial, he had requested that corrections be made in his deposition, evidence as to the response made to the request by respondent's attorney was properly excluded.

16. SAME—INDORSEMENT OF NAMES ON INFORMATION.

Where the court on a criminal prosecution receives in behalf of the people, in impeachment of respondent's witness, certain testimony of which the prosecutor had no knowledge before the trial, over respondent's objection that the name of the impeaching witness is not indorsed upon the information, his action is equivalent to an order for an indorsement, and hence is not erroneous.

17. CRIMINAL LAW—GOOD CHARACTER—INSTRUCTIONS.

A requested instruction that evidence of respondent's good character may be considered sufficient to raise a doubt as to his guilt, even against positive testimony, is properly qualified by the statement that it may be sufficient "under some circumstances, and at all events must be taken into consideration by the jury, and given such weight as they think it entitled to."

18. SAME—TRIAL—CONDUCT OF COUNSEL.

Counsel are no more warranted in departing from the proper practice in conducting the defense of a person accused of crime than they are in the conduct of civil cases.

19. SAME—INSTRUCTIONS—RESPONDENT'S TESTIMONY.

It was error to refuse to instruct in a criminal case that the respondent's testimony is to be tested the same as that of other witnesses, and that, if rational, natural, and consistent, it may outweigh the testimony of all other witnesses.

20. SAME.

It was error to refuse to instruct the jury that they must acquit respondent if they were not satisfied beyond a reasonable doubt that each material fact, or necessary link, in the chain of facts and circumstances by which respondent's guilt was sought to be established, had been proved by the people.

21. SAME—STATEMENTS OF RESPONDENT WHEN ARRESTED.

It was error to refuse an instruction that statements made

by respondent at the time of his arrest "are to be received with great caution; for besides the danger of misapprehension of witness, or the misuse of words, the failure of the party to express his own meaning, and the infirmity of memory, it should be recollected that the mind of the prisoner himself is often oppressed by the calamity of his situation, and that he is often influenced by motives of hope or fear to make statements."

GRANT, C. J., dissenting from reversal; holding that such of the requested instructions as were necessary to be given were sufficiently covered in the general charge.

Exceptions before judgment from St. Clair; Vance, J. Submitted May 2, 1899.   Decided July 11, 1899.

Owen McArron was convicted of manslaughter.   Reversed.

*John B. McIlwain* (*O'Brien J. Atkinson*, of counsel), for appellant.

*Horace M. Oren*, Attorney General, and *Joseph Walsh*, Prosecuting Attorney, for the people.

HOOKER, J.   The defendant was convicted of the offense of manslaughter.   He had been put on trial upon a former occasion, but the jury did not render a verdict.   The information charged that the defendant " did kill and murder " the deceased.

At the time set for the trial, a challenge to the array of jurors upon the regular panel was interposed upon several grounds, only one of which appears to be urged in this court.   That ground is that "the venire was issued before the signature of the sheriff was obtained to the proceedings selecting said jury."   This seems to have been based upon an affidavit made by one of the defendant's counsel, stating that such proceedings appeared to be signed by him at the time of making the affidavit, *i. e.*, February 7th, but that they were not signed until Saturday, February 5th, which was after the issue and service of the venire.   The

practice of drawing a jury in St. Clair county is under a statute made expressly for that county. It is Act No. 213, Pub. Acts 1893, as amended by Act No. 46, Pub. Acts 1895. By these acts, the drawing of the regular panel is made the duty of the clerk, sheriff, and circuit judge, or some other specified officer in place of the judge, if he is not present. Section 10 requires the officers acting at the drawing to sign the record thereof. The prosecuting attorney filed an answer to the challenge, alleging that the sheriff participated in the drawing, although he did not sign the record until February 5th, and that upon February 8th defendant was placed upon trial, and that his counsel participated in the examination of jurors, until only four of the regular panel remained; when upon the 9th day of February, 1898, an order was made by the court reciting that a sufficient number of jurors were not in attendance upon the court to form a panel to try said cause, and ordering 30 talesmen to be drawn and summoned from the jury list in the same manner provided by law for the drawing and summoning of regular jurors, and that they be summoned by the sheriff to appear on February 10, 1898; and that on that day they appeared, and counsel examined them, and finally announced themselves satisfied with the jury, and the jury was sworn. Afterwards the challenge to the array was interposed. It is evident that this was purposely withheld until the jury was sworn, because the affidavit was made on February 7th, the day before the term opened.

The record discloses that the statements of the answer as to what occurred upon the trial were true. There is nothing to indicate that the jurors had not the qualifications for jury service, and it appears that, as a fact, they were regularly drawn and summoned. If they were not, and the drawing had been irregular, we should think the defect had been waived.

The prosecutor stated that he proposed to try the defendant for manslaughter, as he considered that he had been acquitted of murder. After a witness had been

sworn and testified, defendant's counsel objected to further testimony, upon the ground that the information did not contain a charge of manslaughter, and that, as he could not be tried upon a charge of murder, there was no charge upon which he could be tried. We do not pass upon the question of his liability to trial upon a charge of murder, but we are satisfied that if there had been a conviction of manslaughter upon the first trial, whereby, under our decisions, he had been acquitted of murder, he would have been subject to trial for manslaughter under the same information, after a reversal or vacation of the verdict. See *People* v. *Gilmore*, 4 Cal. 376 (60 Am. Dec. 620); *State* v. *Hornsby*, 8 Rob. (La.) 583 (41 Am. Dec. 314).

Furthermore, our statute (2 How. Stat. § 9527) provides that an indictment for manslaughter shall be sufficient if it aver that "the defendant did kill and slay the deceased." The word "slay" was not included, but as it is a synonym of "kill," and as all the elements of manslaughter were included in the information, we think its omission was immaterial, and the more heinous charge of murder might be treated as surplusage, just as it would be had he been convicted of manslaughter on the first trial; or we may say, as is frequently said, that this charge of murder included the lesser offense. There is a clear charge of unlawful killing in a good information for murder.

The prosecution introduced testimony tending to show that Mrs. McArron, the defendant's mother, and several of her children, were in or near a dwelling in the process of erection upon her premises, and that several small boys annoyed them, and that one' of them, in speaking of a noise that was heard, said "that it was Mrs. McArron's ghost;" whereupon the defendant rushed out, saying, "I will show you whose ghost it is," and, not heeding the deceased's protest that he had not done anything, struck him, and death resulted. The defense maintained that the defendant did not go out into the road, or have any altercation with or strike the boy, and some testimony was

introduced tending to establish the fact that defendant was elsewhere at the time this was said to have occurred. This outline of the case will be supplemented by necessary particulars in connection with a discussion of some of the questions raised.

Defendant's brief states that Miss Sylvia Lovick was permitted to testify that "some time prior to the time of the offense charged, and entirely disconnected with it, she was out in her yard, and saw Mrs. McArron and her children, including the defendant, back near the barn, and Mrs. McArron said, 'Order them out; make them go away;'" and that, on cross-examination, she said she heard no answer, and did not see any boys around there at that time. Counsel maintain that this was earlier in the evening, and therefore not a part of the *res gestœ*. The testimony, as given, was as follows:

"I heard Mrs. McArron speaking, and Owen [the defendant] was present. She said, 'Order them out; make them go away.' I didn't hear anybody answer her. After that, I went back to the house, and paid no further attention to what the McArrons were doing. After I went back to the house, I sat on the steps, on the south side. The next thing I noticed a boy running past on Stone street. * * * It was almost right away after I got back. * * * The next thing I noticed a woman and a little girl standing on the cross-walk, looking at something nearly in the direction of the McArron house. Then Kate McDonald came into our place, and this woman turned back to the sidewalk, and then passed our place. The girl was with her. She soon returned, and asked for some water, and we all went to the place where the boy was lying. This woman was Mrs. Castaline."

Mrs. Castaline was called as a witness, and also a Mrs. Miller, and their testimony was such as to warrant the inference that it was all one transaction, and that the attack immediately followed the direction of the mother to "make them go out." The testimony was admissible.

Mrs. Castaline and her daughter were allowed to testify that they saw the scuffle, and identified the defendant, and that after the affray Mrs. McArron said, "Now, see

what you have done." This is said to be error. We will
quote at some length from the testimony of these witnesses.

The first one sworn was the child, 10 years old. She
said:

"Ten years old last July. Live on Church street.
Remember the night Kilbourne Seeback was killed. I
did not know Kilbourne Seeback before that night. I
knew McArrons by sight. After father had gone to
church, my mother and I got ready and started to visit a
neighbor on Church street, and, when we turned off Church
street to go onto Stone, a boy ran by. I didn't know who
the boy was. He ran right into us, and we looked to see
what he was running so fast for. He ran into mamma.
He was running south, on the west side of Stone street.
We turned around to see whether the boy kept on run-
ning. He ran away down Stone street, and we turned
around, and walked on again, passed the church, and went
on the cross-walk, until we got about on the center of it.
Then we heard loud talking about in front of McArron's
new house. When we first came on the cross-walk we
heard two voices, but afterwards I heard three. The two
voices that we heard were men. After we heard them,
I saw two forms under the trees. One seemed to be back-
ing up, while the other was pressing forward. One of the
forms was dressed in light from his waist up, and the
other was dressed in dark clothes. One of them looked as
if he had a cap on the back of his head, and the other had
a hat. The one dressed in light had the cap on. The
one in dark clothes was backing up, and the one with
light from the waist up was pressing forward. One voice
was apparently pleading and low. I could not understand
what the other was saying. It was in a coarser tone, and
a little lower. I couldn't understand the other; and the
one with the pleading voice said, 'Quit; leave me alone;
I haven't done anything.' I could not distinguish what
the other one said. It was gruffer, and I could not under-
stand it. The other voice that I heard was a woman's
voice. I think it came from inside the yard; it came
from that direction. It said, ' Come in out of that;
you've done enough; leave him alone.' When I first
looked up there the forms were under the trees. They
kept waving back and forth. First they were under the
trees, then they wavered out towards the road again.
They were moving right around in front of McArron's

house. The taller of the two was slim; the other was
stubby. The one in dark was a little the tallest, and was
backing up, and the stubby one was pressing forward.
Then, after I heard a woman's voice, I heard a loud·blow,
as if some one had been struck by another person. I
didn't see it, but I heard the blow. At that time the
forms were under the trees. I could not just see them
real plain; I could just hear the blow. Then some one
walked away into the yard towards the barn. When he
walked in through the gate, mother and I were about in
front of front steps of Lovick's house, going towards McAr-
ron's new house. We started from the cross-walk when
we heard the loud blow. After he went in through the
gate, and turned around once or twice, and then after-
wards he turned right straight around and spoke, and
then Mrs. McArron came in sight, and he talked to her.
She was a little ways from the gate. She came in be-
tween Owen and mamma and I, like. Owen was a little
farther away. She said, 'Now, you see what you have
done.' At that time he was facing towards Mrs. McAr-
ron's, and at the same time he was facing us. I could
see his face, and recognized him as Owen McArron.

"*Q*. What, then, did Mrs. McArron say at that time to
Owen? (Objected to as incompetent and improper. It·is
not part of the *res gestœ*, and cannot bear upon this case.
Whatever occurred after the alleged hitting is not a part
of the *res gestœ*.)

"*The Court:* I think we will take it. (Exception.)

"After she said, 'Now, you see what you have done,'
and he swore, and says, 'I will show him,' that is all that
was said. Then he turned around, and walked on to-
wards the barn. He went around the house, and I lost
sight of him. I first knew who that form was when he
crossed the sidewalk to go into the yard. At the time
we were about in front of Lovick's house. I had seen him
before that most every day. I had no doubt that night as
to who it was, because I knew him as soon as I saw him.
After he went back towards the barn, mother and I
started to walk on towards where we had seen him walk
away. Then Mrs. McArron walked out of the yard, and
went to where this boy was lying, and we were almost
there; and when we got almost there we stopped to see
what Mrs. McArron was going to do. There was no one .
else there at the body at that time, only Mrs. McArron.
Mrs. McArron came out, and bent over the body, and

said, 'Get up out of that, and go home. What are you lying there for?' and then she stooped over, and looked all around; and then she saw mamma and I, and she called us to hurry up quick, to see what was the matter with this young man, and then we went up there. And we seen this form lying there under the trees at that time. There was no one else there but Mrs. McArron. My mother went away for something at that time. I didn't know where she went. I was looking into the boy's face, to see if I knew him. When she came back she had a pitcher of water. I don't remember anybody coming there while my mother was gone; there might, but I don't remember. After my mother came back, Kate McDonald, Mary McDonald, Sylvia Lovick, and I think Allie Lovick, and myself, were there. I was there when the body was taken across to Leach's. Mr. Ellsworth and Mrs. Leach took it."

This was her entire direct examination. We shall have occasion to allude to her cross-examination later, but this will suffice at this time to show that Mrs. McArron's remark was a part of the *res gestœ*, and also that it was proper to explain the remark of Owen McArron, which followed, who, according to the testimony of Mrs. Castaline, swore, and said, " I will show him."

In this connection, we will allude to the rulings of the court in relation to the testimony of the girl Hattie Castaline and her mother. The girl testified as follows on cross-examination:

"I ask you if I may go because I want to go; it is necessary for me to go.

" Q. And hence you ask the same question you did the last time you were on the stand. Who told you to ask that question at the end of your testimony?

"A. Nobody.

" Q. Who told you it is necessary for you to go down?

"A. Because I want to go; I would like to be excused for a few minutes. ( Court takes a recess. )

"*By Mr. Atkinson:* I have been sworn once before, and know what an oath is. No one told me, but I read about it in the Bible. The quotation is that you should never tell a lie; that is one thing; it is against God's commandments. If you should tell a lie, you would be

going against God's commandments. It don't just say about an oath, but it says you shouldn't lie, and you should not bear false witness against your neighbor. It is God's commandments there. If I should tell a lie, great punishment would fall upon me. I would be banished from the sight of God forever, and from everything that is good, and it would be an awful thing to be banished from the sight of God. I would be in the home that is prepared for the devil and his angels. I don't know how long I have been studying the Bible. I read it whenever I can. I cannot just tell you when I commenced. My mother was my mother when I commenced, of course. She is the woman in that room now. My mamma often helped me with the Bible. She was with me the first time I ever read the Bible. I lived at Perry before I came to Port Huron, but I don't know how long.

"*Q.* What is the reason you don't know anything about time? Has your mother told you not to remember anything about time?

"*A.* No, sir; but I never heard the day and date.

"*Q.* I am not asking you the day and date.

"*Mr. Walsh:* Let her answer the question.

"*Q.* I want to know something about the time you lived in Perry.

"*Mr. Walsh:* I object to Mr. Atkinson when he asks a question shutting the witness off before she gets through. He asked her why she didn't give the time.

"*The Court:* Answer it now, if you want to.

"*Mr. Atkinson:* I didn't ask her about the day and date. This child is evidently arranged.

"*A.* I didn't pay any attention to how many years I lived in Perry. My brother, Louis Forbes Castaline, and papa and mamma and myself lived together in Perry. My brother is learning a trade at Perry. Mr. Atkinson, I don't know the age of my brother. I will not tell you, for I am not certain. He is older than I am. I don't know how old he is. I thought that was your name, Mr. Atkinson. I didn't think it was any harm to call you Mr. Atkinson. I don't ever remember of hearing his age.

"*Q.* Is this woman who is with you his mother also?

"*A.* Yes, she is. He is learning the blacksmith trade. He is older than I, but I don't know how much older. Miss Morris was my school-teacher at Perry. I forget the name of the other teacher. I am not very good at remembering names, but I am quite good at remembering

faces. Miss Morris was my first teacher. Mr. Wheaton was superintendent of the school. I don't know where Miss Morris lives now. I never heard from her after I left there. I don't know whether or not her people live at Perry. I don't remember which way the postoffice or railroad was. I don't remember hardly anything out there, for I was quite young. I used to speak in the church at Perry different times. I was old enough to speak. I like to speak for Jesus, whenever I get a chance, and I will, too. I like to speak. I remember that Mr. Grayton, Osborne Brown, and different ones were in business at Perry. I remember walking down Pine Grove avenue with Charlie Rettie after this Seeback occurrence. I tried to get away from him. If he had any sense at all, he would know that his company was not wanted, because I tried to get away from him.

" Q. Why did you say if he knew anything he would know that his company wasn't wanted? Is that charitable for a little girl that talks in church?

"A. Well, I don't like to talk with boys, anyway, because I am not old enough. I tried to walk just as fast,— pretty near ran. Just as soon as I started to walk fast he started to walk fast too. I thought he would get tired some time. I didn't say to him that I didn't know anything about who it was that struck the Seeback boy that Sunday night. I was going down town. I don't know how many years I lived at Perry. I was in the habit of speaking in church. I don't know how many months; I cannot guess months, when I do not know them.

" Q. Do you remember when you first became acquainted with this woman you call mamma?

"A. Well, Mr. Atkinson, I don't know any other mamma but this one. I don't remember that you asked me that question before. (Objected to as improper.)

" The Court: You mean on the former trial?

" Mr. Atkinson: On the former trial.

" The Court: I sustain the objection.

" Mr. Atkinson: The point I wish to make is, this child's testimony is worded for her.

" The Court: I think there should be some consideration given to her age. (Objection sustained. Exception.)

" Q. Now, do you remember this woman that you call mamma talking about your own mother to you?

" A. No, sir; I do not.

" Q. Do you know that she is not your mother,—this woman?

"*A.* No, sir; I do not.

"*Q.* Of course, you cannot tell us, then, where she met your father?

"*The Court:* Now, Mr. Atkinson, you are going too far.

"*Mr. Atkinson:* I think I should be allowed to ask that question.

"*The Court:* I think not, with this child; I don't think you should.

"*Mr. Atkinson:* Well, this is simply some of the acting.

"*The Court:* No; I don't think that is warranted at all.

"*Mr. Walsh:* There should be some limitation on this man—

"*Mr. Atkinson:* Well, certainly, I am pursuing as mild an examination as I can.

"*The Court:* I do not think you should go into that inquiry with a girl of her age.

"*Mr. Atkinson:* I will say this, if I am compelled to ask this witness questions on a regular line, without stepping from one thing to another, the cross-examination will be ineffectual.

"*The Court:* I do not put it on that ground at all. Their family relations are something I will not permit you to ask this little girl.

"*Mr. Atkinson:* And I propose, by cross-examination of this little girl, to show that she is untruthful.

"*The Court:* If she was older, I might feel differently; but I do not think you have a right to ask these questions of her.

"*Mr. McIlwain:* I would like to have on the record the fact that the little girl is shedding tears.

"*Mr. Atkinson:* I ask permission to show by this witness, and propose to show by the witness, that she is untruthful. That is the only thing I can do, because I know the child's information must be limited to those things.

"*The Court:* You will have to show it from some other source. I will not permit you to go into that with this little girl.

"*Mr. Atkinson:* Then we will take an exception. I would like to put a proposition upon the record.

"*The Court:* You can put it in writing, and the stenographer can put it on the record; not to state it to the witness or in the presence of the jury. I make that ruling on account of the former case.

"*Mr. Atkinson:* Then I will state to the stenographer so the jury cannot hear me. I propose to ask this witness questions in reference to her own mother; her personal appearance; the time of her death; her burial; place of her burial; who attended the funeral; and to show by this witness that, within two years of the time they left Perry, and since the 1st of November, 1893, she first became acquainted with Maggie Castaline, who now pretends to be her mother, and the person who is referred to as 'mamma,' and other circumstances of that kind, so as to show this witness is untruthful; and also in reference to her brother, who is a young man.

"*The Court:* If you confine yourself to those questions, you may ask them. They are very different from the ones you asked her before, and that is why I ruled against them.

"*Q.* When did your mother first become acquainted with your father?

"*The Court:* I won't permit that; that is not the question you propose on the record. You proposed to ask about her mother, when she died, and so forth. You may ask it; but to go into the family relations of her mother, as she calls her now, and her father, I won't permit it.

"*Mr. Atkinson:* That is the point I wish to get at,— one point is the family relations.

"*The Court:* I am willing to let you ask the questions you proposed there, but not that one.

"*Mr. Atkinson:* I propose also to ask of the family relations between Maggie Castaline, now called 'mamma,' and this girl's father, and when they commenced, under what circumstances they commenced, and that they were after November, 1893, for the purpose of showing that she knew that this was not her mother, and that this witness is untruthful.

"*The Court:* No, I ruled against the last proposed question; the first you may ask, if you desire. (Exception.)

"I attended only one funeral at Perry, and that was from the church. My mamma was with me. I don't just remember how long ago it was. I never attended a funeral with my brother. I used to go to Sunday school at the church with my brother, but not to church services with him. I commenced talking in the Salvation Army in Port Huron when they came here, but I don't

know how long ago it was. I don't know how long we have been here in Port Huron. I think it would be a sin to conceal the truth. Mr. Walsh told me, when I first talked to him, I was to tell what I knew, and he didn't say, 'Hattie, tell how many,' nor he didn't say, 'Hattie, tell what you guess,' but just what I knew, and I am going to tell just what I know, and I don't know just how many years. I cannot guess; I never tried it. I couldn't guess how many years I have been in Port Huron. I remember we came to Port Huron on the train, but not what direction. The first house we lived in in Port Huron was on Poplar street, Mr. Hendrick's house. I cannot tell you how many years ago that was. Mrs. Cutliff, Mrs. Shortbridge, and others were our neighbors. I remember Mrs. Richardson and Mrs. Wells, but not Mr. Currie. I wouldn't know him if I saw him. I know his little girl. I remember Mr. Richardson and Mr. and Mrs. Teeple, the dentist. I am in the habit of going to church, but I didn't go to church that evening, because papa went, and mamma didn't feel like going; and mamma asked papa if he would take me, and he said for me to stay home with mamma if she was going to stay home. I don't know whether mamma intended to go or not when papa went to church. I did not intend to go out. It was too early to go to bed. I had not undressed partially, but only ate my supper, and went into the other room to sit down. I never tried to guess, and would be afraid I couldn't get it right.

"I couldn't tell you how long after father went away until I and mother left. I don't know how long after father had gone to church before mother and I started out. I did not look at the clock. When Mr. Walsh first talked to me, he said, 'Hattie, tell me what you know.' He didn't say, 'Hattie, tell me what you guess.' So, anyway, I could not guess time anyway; I never tried it; I would be afraid I couldn't get it right. I don't have to follow his instructions, only he told me to state what I knew, and when I got up there I did; for Mr. Walsh told me to tell what I knew of the matter. I thought when I got up here I would have to tell the same, too: He didn't say to me, 'Hattie, tell us what you guess.' I can't guess, because I couldn't get it right. In the former trial I didn't say that my shoes were off when mother talked about going, nor that I put on some slippers. I had worn my shoes in the morning, but I took them off, and put slippers on, and went out in the afternoon. I did not tell

you that my shoes had been taken off to go to bed, and mother talked about going out, and I found my slippers. When I went out on the street I didn't look for the electric lights, so I couldn't tell now whether they were lighted or not; I don't know whether they were; I didn't look. I don't remember seeing any electric lights. I don't see how it could be lighted at that time. It was quite light. It wasn't what you might say daylight, but it was kind of twilight. It wasn't dark. When we went by the church I think I heard, when I got around at the side of the church, I heard the minister's voice, but I couldn't say; that is, that is when I got at the side of the church, not when I got in front. I didn't see anybody at the side of the house. I don't remember passing anybody along the side of the church. I don't remember seeing any girls over on Bragg's corner, nor on the corner south of the church. I remember when we turned the corner a boy ran by. I had been walking carelessly along, and wasn't looking what you might say very much any place, and all I can remember is seeing the boy run by when I was walking. I don't know whether the minister was preaching or not. I couldn't just understand what he was saying, and I didn't listen. I didn't see who the minister was. I didn't hear any singing in the church. I don't remember whether the front door of the church was open; I didn't look. I have only been in that church one time, and that was at a funeral. I was never to the cemetery at Perry, to my remembrance.

"Q. Don't you know where your mother's grave is in the cemetery at Perry?

"A. Mr. Atkinson, I don't know any other mother but this one I have.

"Q. Can you remember back as far as four years?

"A. No, sir; I don't remember hardly anything. I don't remember any new thing that I got four or five years ago.

"Q. Do you remember anything that happened at Perry?

"A. I remember the Fourth of July celebration when the balloon went up. I don't remember what year that was. I don't remember whether it was the year I came to Port Huron. All I can remember is that it was the Fourth of July, and that the balloon went up, and a man in it. I do not remember the man who had charge of it. I knew the man's name that went up in it, but I have forgotten it now.

"*Q.* Was this woman with you then?

"*A.* Yes; she was.

"*Q.* And that was the year you got acquainted with her?

"*A.* Well, now I don't know.

'*Q.* When did you get acquainted with your mother?

"*A.* I don't remember when I got acquainted with my mother.

"*Q.* If you never saw this woman until after November, 1893, you cannot remember anything before 1893; is that it, if that is a fact?

"*A.* I don't know what you mean.

"*Q.* November, 1893, would be just four years ago last November; and the Fourth of July celebration you say this woman was with you?

"*A.* Yes.

"*Q.* So that must have been after that time, if you didn't know her until after that time. Can you remember anything the year before that?

"*A.* No; I cannot remember so far back as that. I learned my letters from my brother. We then lived at Perry. I don't remember whether he bought the books to teach me the letters. I know I had the books, but don't know where I got them, and I didn't care as long as I had the books. I don't care where I got them. My father didn't have to help to teach me my letters when I had a brother to teach them to me.

"*Q.* Is it the proper thing for a brother to teach a little child letters?

"*A.* He didn't have anything else to do but to go to school and teach me my letters, so it wouldn't hurt him much. He was going to school at that time in Perry. I don't know how long before I went to school that he taught me my letters, but I know I didn't start to school until I knew my letters.

"*Q.* At the time your brother was teaching you your letters, when you were three or four years old, was the woman you call 'mamma' there?

"*A.* Yes, she was, Mr. Atkinson.

"*Q.* Why didn't she teach—

"*A.* You can say all manner of things. You can abuse me all you want to, and I won't say anything that will be mean to you, for I respect old people. When you are abusing my mamma you are abusing me. I like you all right. I will tell you what I know; that is all. I think

your questions are unkind to me. When that boy ran against mamma he kind of whirled around her (indicating). After he passed, I looked around to see what was the matter, and he was running right on down, and I turned around and started to walk on. Mamma looked after him, too. I just looked around, and turned right back again, and I didn't see any one else in that direction. We walked on in front of the church. I don't remember of seeing or looking to see if there was a lady sitting in front of the church. We then started to go across the street. It was not awfully dusty. It did not rain that day. I had been down to the park that afternoon with mamma and papa. When we got upon the cross-walk no team or buggy drove by. I didn't look over towards Leach's house to see if any one was sitting on the side veranda. When I got upon the cross-walk I heard quite a loud noise. It wasn't so very loud. It was louder than you are talking now. I don't know whether it was loud enough to be heard 150 feet. I did not see anybody go across the street, nor I didn't notice any lady coming down the street, while I was there on the cross-walk. I don't know whether I would see her or not. I was in the center of the cross-walk, and would be looking kind of over that way to where these forms were.

"*Q.* I understand you didn't see any form fall?

"*A.* No, sir,— yes, I did.

"*Q.* Did you ever tell that before?

"*A.* You didn't ask me whether I did or not.

"*Q.* Do you think it is a sin to conceal the truth?

"*A.* Well, I do; but I was not concealing the truth.

"*Q.* Did you ever tell Mr. Walsh?

"*A.* You won't let me answer anything. I only answer what you ask me. You didn't ask me that question before.

"*Q.* Now you say you saw the form fall?

"*A.* I seen the form disappear.

"*Q.* Well, you said you saw the form fall.

"*Mr. Walsh:* She has not said anything of the kind.

"*Mr. Atkinson:* If the stenographer will read to Hattie what she said —

"*Mr. Walsh:* The objection I wish to put is right there; as soon as she said that, she started to explain what she was going to say, and she was shut off by counsel.

"*The Court:* I do not understand it so.

"*Q.* Now, will you tell the jury what you meant when you say that you did see that form fall?

"*A.* I will tell you what I meant. When I seen this man walk away I watched him, and when he got out of sight I looked for the other form, and it had disappeared.

"*Q.* Then you didn't see him fall?

"*A.* I didn't see what you might say see him fall, but I seen him that he disappeared, and I don't know where he disappeared to. It was not awful dark under the trees. You could see under them where I was standing. I not only heard loud talking, but I heard a loud blow. I thought it was an awful loud blow, so I could distinctly hear it. I do not remember hearing three blows. I didn't tell Mr. and Mrs. Leach a few days afterwards I heard three blows. Have never talked with my mother nor father about this case. My papa won't let me talk about this matter at all. Owen McArron never sold an ounce of milk to mamma, and was never inside of our house. After we heard that blow, we started right away down from the walk after hearing it. We wanted to see what had happened. I didn't say on the last trial that we stood about a minute on the walk after hearing that blow struck. I did not see the blow delivered, but I heard it. I didn't see any one fall, but I noticed one form distinctly; I noticed the one that passed into the yard. I looked for the other one, and the other one had disappeared. I wondered where he had disappeared so quick. When I was on the cross-walk I didn't know but what the two boys were there, but when I got in front of Mrs. Lovick's one walked away. I do not know how long the minister had been speaking at the time I left the cross-walk. I don't know just how long, because I didn't hear any voices afterwards when we got in front of the church, so I don't know whether he was speaking all that time or not. I do not know just how long it was from the time I left that cross-walk before the people came out of the church. When I heard that blow I didn't look to see if there was anybody sitting on Lovick's veranda. I didn't see the McDonald girl come out of Lovick's, and go down the street, while I was on the cross-walk. I don't know whether I could see her or not. I was paying too much attention to the forms under the trees, and I didn't stop to look around to see things. I couldn't be looking at these forms and be looking at her too. We were about the center of the cross-walk, so near as I can recollect. I don't remember of telling Sylvia Lovick of this occurrence the next day. I didn't talk to Sylvia

Lovick about it at all. I did not tell her the person who left there from under the trees jumped over the fence, nor that there were two persons there, nor that one of them jumped over the fence, and the other one around the house to the north. They came after me with something they called a subpœna a short time after this happened. Mother did not call Sylvia Lovick's attention to the flowers on her hat. Mother's hat was lying on the sewing-machine. Mother did not show Sylvia the hat with the blue violets on it. I got my hat, and Lottie Lovick came, and we both went out to play jacks. When Sylvia came in, mamma's hat was lying on the sewing-machine, and just as quick as Sylvia, I think, told me that Lottie was out wanting to play jacks, I went and found my hat, and took my jacks, and played. Mother was worried that evening, and when she comes in she often takes off her hat. She took it off, and laid it on the sewing-machine. She don't usually leave it there, but sometimes, when she is tired and don't feel like putting it away, she leaves it there. I have not heard mother say that she laid her hat on the sewing-machine. Sylvia didn't come in the night. I don't play jacks at night. I remember the hat was on the sewing-machine, also, because I looked for my hat. Sylvia was sitting in the sitting-room. Mamma was lying down when Sylvia came in. I remember when I was looking for my hat I couldn't find it, and I looked around the sewing-machine, and I saw mamma's hat there. I found my hat hanging up. I remember John L. Black's little girl. I used to play with her.

" *Q.* Do you remember going out one day and smearing her dress all over with mud? (Objected to as immaterial, and sustained.)

" The body was west of the trees. His head was about even with the tree. Mrs. McArron was holding his head in her lap when I got there. She was on the east side of the body. I didn't see the dipper at all. Don't remember seeing Mrs. Truesdell come there. I saw the pitcher that mamma brought. First saw Mrs. Truesdell that night at Leach's, after the body was taken there. Mrs. Leach and Mr. Ellsworth came after mamma came back with the water. When he got into the yard, he turned once or twice. Then, when he got into the front of the big window, he turned right straight around, after he said what he said to his mother. Then he turned around again, and walked around the end of the house, and I lost sight of him. He walked around the north end.

"*Q.* Now, in your former testimony, did you state any such thing as his going near the window?

"*A.* You didn't ask me where he stood then.

"*Q.* Didn't you tell us where he went?

"*A.* I told you he went in that direction.

"*Q.* Did you say anything about the window?

"*A.* No, sir; because you didn't ask me.

"*Q.* Did you say anything about going around the north side of the building after you heard the testimony of young Rettie?

"*A.* I didn't hear the testimony of Charlie Rettie.

"*Q.* Did you not, in former testimony, say that he went in through the gate, and disappeared in the yard, towards the barn?

"*A.* No, sir.

"*Q.* Wasn't that the way you put it?

"*A.* No; I said he went in the direction of the barn, through the gate, and he stopped still to talk again. I didn't say he disappeared right away. He went in through the gate, and then he kind of went across, and he kept looking around, and when he got about in front of the window he stopped to talk. He was talking to his mother. She was south of the driveway. She was just a little ways from the gate, facing him, with her back to us. I didn't say to young Rettie on Pine Grove avenue that I saw Owen McArron come out of the lot and strike the blow, and then disappear around the north side of the house. He walked through the gate, and then he turned down that way, and stood in front of the big window, and talked, and turned around, and went around the north end of the house again. That would be the end towards Huber's. I don't know how many parties there were under the trees after I got past Lovick's side porch, but I know I was watching the one that went away to see where he was going. I didn't stop in front of Lovick's, but kept going up, getting nearer all the time. I have not changed my testimony. My school-teachers, since I came to Port Huron, have been Miss Lee, Way, Goodman, Monroe, and Miss Cowan. Before leaving the cross-walk, the electric light did not flash up. I didn't look to see whether the electric light was lit or not when we got on the cross-walk. I don't know how long my mother and I stood on that cross-walk, looking up there. The conversation that I heard there, and that my mother heard, was not between Mrs. McArron and the boy, and I

have not put Owen McArron in there purposely. His mother was standing nearer to me than he was, in front of the new house, and talking to his mother. We were in front of Mr. Lovick's house. We stood in front of Lovick's until he disappeared, and Mrs. McArron, and then we started to walk on after he disappeared. I didn't testify on former trial that he went on the south side of the house, back to the house.

"*Q.* Where were you when you heard the loud blow?

"*A.* About in front of Mr. Lovick's house.

"*Q.* Are you quite sure of that?

"*A.* Yes, sir.

"*Q.* Where was your mother at that time?

"*A.* She was with me.

"*Q.* Do you say in front of Lovick's east front door?

"*A.* It was the front door facing the street.

"*Q.* Facing Stone street?

"*A.* Yes, sir.

"*Q.* And you had passed Lovick's porch?

"*A.* I had passed their side porch, and was about in front of their front porch.

"*Q.* Do you remember on the last trial swearing positively several times that you heard that blow struck before you left the center of the cross-walk?

"*A.* No, sir.

"*Q.* Haven't you so testified on this trial?

"*A.* No, sir.

"*Q.* Do you now want to say that you heard the blow struck after you had got past Lovick's side porch?

"*A.* Yes, sir; I was in front of their front porch. In the former trial I testified that when the blow was struck I was standing on the cross-walk in the center of Stone street. I do not now testify that I was standing in front of Lovick's when the blow was struck. I said when Owen McArron walked away I was standing there in front of Mr. Lovick's house. I said I wasn't in front of Lovick's when the blow was struck; I was on the cross-walk when the blow was struck. I was in front of Lovick's when Owen McArron went away. There was no blow struck while I was in front of Lovick's. After we heard the blow struck, we went right away down, right after. After Owen McArron struck the blow, he started off right away, and walked away into the yard. I don't know where he did just strike the blow, because I did not see him, but I know he walked in through the gate. While we were on

the sidewalk, the bodies wavered back under the trees.
They wavered out on the side next the road, and then
they wavered back under the trees, and after that I heard
a blow.''

Upon redirect examination witness said :

''I had some words with mother just after Owen Mc-
Arron had left in front of the house and went.   When
Owen McArron left the big window, after talking with
his mother, he went around the north end of the house,
and disappeared.   That was the end towards Huber's.
We were standing in the center of the cross-walk when we
heard the blow, and, if I have told it in any other way, I
had no intention of changing that statement in any par-
ticular.   When Mr. Atkinson asked me when I said the
blow was struck in front of Lovick's house, I didn't under-
stand his question.   There was no electric light on that
corner.   Didn't hear Mrs. McArron speak to the body
until I was pretty near.   She was stooping over the body,
outside of the gate.   After I left the cross-walk, and when
I got pretty near up there, I heard Mrs. McArron talking
to the body.   I wasn't far away from her.   I had not
passed the gate, and at that point was the first point when
I heard Mrs. McArron speaking to the body.   Mrs. Mc-
Arron was stooping over the body, outside the gate, when
mother was with me.''

Margaret Castaline, the mother, testified as follows :

''I live on Church street, three houses west of the
church.   We have lived there since last May.   Hattie
Castaline is my stepdaughter.   Have been married to
Castaline five years.   I know McArrons by sight only.
The back end of our lot runs up to the barn-yard of their
barn; just a fence between.   I know Owen McArron by
sight when I see him.   Have known the McArrons by
sight ever since I moved there, in May last.   I remember
the night Kilbourne Seeback was killed.   Hattie and I
are members of the Methodist Church.   My husband left
home between the time of the first bell and the last bell
for service.   The first bell is supposed, I think, to ring at
7 and the last bell at 7 :30 o'clock.   The 25th of July last I
left home to go to a neighbor's, on the other side of Stone
street; that night, sometime after the last bell rang, be-
tween half-past 7 or 8 o'clock,—perhaps nearer to 8.   My
little girl was with me.   When we got to the corner of

Church and Stone streets, a boy ran by us, just after we turned on Stone off Church. He was a good-sized boy. Ran south on Stone street, on the west side of the street. When he ran against me, he kind of turned me around, and I just looked after him for an instant, to see if I could make out who he was. I seen him until he got to the opposite side of the street, where Lovicks live at the present time. I didn't recognize him after he passed us. We went along until we got to the center of Stone street, on the cross-walk, and I heard somebody talking north on Stone street. I could not understand what one person was saying, but I could hear what the other one was saying. I saw the forms of two persons. One of them was dressed in light from his waist upwards, with dark pants, and the other one was dressed all in dark. The one that had the light waist on, he looked to have a cap set close to his head. The other one had a hat on, sitting on the back of his head more. One voice was more like a woman's voice. Still, you could distinguish that it was a man that was speaking, with a fine voice. The other one, his voice was lower,—more of a coarser voice. At the same time I heard another voice. It seemed to be coming from inside ·the yard. It was a woman's voice. When I saw these two forms, they were shifting about there in front of McArron's house, on the side of the trees next to the center of the road. The person with the fine voice was saying, ' Leave me alone. I didn't; I didn't do anything. Leave me alone,'— something like that. At the same time he was stepping back, and the other form was stepping forward. The one in dark was stepping backwards, and the other was stepping forwards. The woman's voice in the yard said, ' Come in out of that; you've done enough. Do you hear ? Come in,'—in rather a commanding way of speaking. I heard the sound of a blow. At that time they were standing under the trees. The sound of the blow didn't seem as though it was struck on wood or anything of that kind that was real solid; more of a hollow sound, as if it might not strike anything very firm or solid. I don't know as I can describe it exactly. After I heard the blow, I turned around and walked in that direction. Then I saw a man walk away from under the trees. He walked away from under the trees, and went in the gate, and into McArron's yard. As he was going in at the gate there, just leaving the sidewalk like, to pass in, I recognized

him. Then there was a woman came in view. She passed out around between where the man was and where we stood. I recognized that man as Owen McArron.

"*Q.* When she passed out between yourself and Owen McArron, what, if anything, was said?

"*A.* She spoke to him.

"*Q.* What did she say?

"*Mr. Atkinson:* Same objection as to the last witness. (Objection overruled. Exception.)

"*A.* 'Now, you see what you have done.'

"*Mr. Atkinson:* Same objection as to the last.

"*Q.* What did he say?

"*A.* He said— He swore, and said, 'I will show him.' When Owen passed into the gate that night, I was about in front of Lovick's door, when he stopped to speak to his mother. Then he walked in the direction of the barn. I didn't notice where he went to. His mother then walked out towards the street; and, as she got near by the fence, she just halted, and she talked. I didn't know what she was talking to. She looked in the direction of the tree where the men had been standing. She said, 'What are you doing there? Get up out of that. Get up, and go home. What is the matter with you?' At that time I got down about in front of Lovick's house. After she said this, she came outside of the fence, and walked over underneath the trees. I went up a little closer then, and stopped still. She bent over the form under the trees, and was talking to him; and then she raised her head, and looked, and cast her eyes around, and she seen me, and called me to come to her, and see what was the matter with this young man. So I stepped up right close to him, and I asked her who it was. She said she didn't know. I asked her what was the matter with him. She said she didn't know. When I first got there, there was nobody there but Mrs. McArron that I could see. Then I went to Mrs. Lovick's for some water. I got the water in a pitcher, and came back to the body. When I came back, Hattie and Mrs. McArron were there; that is all. I bent over the body, and was going to pour some water into her hands, and I supposed she would hold her hands. Instead of that she ran her hand into the pitcher, and put some water on his face. The body was afterwards taken across the road to Leach's."

We give a portion of her cross-examination, as follows:

"Before moving where we live now, we lived in the wing of Mr. Haywood's house or store, on Pine Grove avenue. Before that I lived in Jarred Teeple's house, and before that on Poplar street. These three places would be in the vicinity of John McIntosh's grocery; and for a short time I lived next Campfield's, near Haywood's store. These houses are in two different wards. These are the only places I lived in. I got acquainted with Mr. Castaline in Port Huron the year before we were married. I got acquainted with Mr. Castaline five years ago last fall.

"*Q.* What was your name when you were married to Mr. Castaline? (Objected to as immaterial. Objection sustained. Exception.)

"*Q.* How long did you know Mr. Castaline before you were married to him? (Same objection, ruling, and exception.)

"*Mr. Atkinson:* This was all admitted on the former trial.

"*The Court:* There were a good many things admitted then that I do not think had any materiality, and I do not propose to admit them this time.

"In the summer and fall of 1892 I lived in Detroit, and I think I was living in Detroit in the year 1891. I don't remember where I was in 1890. Before I went to Detroit, I lived in Port Huron for a good many years. I first came to Port Huron in 1882. The year before I went to Detroit, which would be in '89 and '90, I lived in Port Huron with Mr. Peter O'Neill. I lived there more than one year. It was the last place I worked before I went to Detroit. I worked for Mrs. Peter O'Neill four different times. I lived there from the time she came back from the summer resort in the fall until the next summer. The first place I worked in Detroit was at Mr. and Mrs. George Edwards', on Cass avenue, near Joy street. I also worked at Mrs. White's, a widow lady, living at No. 403 Jefferson avenue. I also worked for Mrs. James McKay, a little farther out on Jefferson avenue. I also worked for Mrs. Platt, who lived on Elliott street, near the corner of John R. I also worked for Lawyer Radford, who lived at 22 Sproat street. No. 403 Jefferson avenue is east of Woodward avenue; is not in that part of Detroit along the river among the shops.

"*Q.* Was it anywhere near the D. & N. depot?

"*The Court:* How can that be material, if she has given you the number?

"*Mr. Atkinson:* Well, the number might not indicate to the jury the character of the neighborhood.

"*A.* There are private residences all around it. After working for Lawyer Radford, I came to Port Huron, in the fall of 1892, and stayed two weeks with Mrs. Peter O'Neill, and from there I went to Perry, in Shiawassee county.

"*Q.* At what places did you live in 1882, when you first came to Port Huron? (Objected to as immaterial.)

"*The Court:* What is the purpose of that testimony?

"*Mr. Atkinson:* The purpose is to establish the credibility and search into the antecedents of the witness, and who she lived with, what name she went by, and what men she lived with.

"*Q.* In what capacity did you go to Perry? (Objected to as immaterial.)

"*The Court:* What do you mean?

"*Mr. Atkinson:* It is very broad.

"*The Court:* That is just the reason I ask.

"*Mr. Atkinson:* The object of these questions is to search the witness, and ascertain her connection—

"*The Court:* Well, if you don't care to explain it, I will sustain the objection.

"*Mr. Atkinson:* Every question is asked, of course, to affect her credibility. (Sustained. Exception.)

"I went to Mr. Castaline's home, in Perry. I went there engaged to be married before I went there. I had no home of my own, so I went to his home.

"*Q.* In what capacity? (Objected to as immaterial.)

"*Q.* Whether as servant or otherwise?

"*The Court:* She may answer that.

"*A.* No, I didn't go as a servant. I expected I would be a servant for a time anyway, to a certain extent. I expected I would be a servant, to go and take the home upon my hands, and the children to look after.

"*Q.* Then it wasn't as a hired servant?

"*A.* No, sir; not exactly; that is—

"*Q.* In what capacity was it, then?

"*The Court:* He wants to know whether you went there hired to do work or not.

"*A.* Well, I went there engaged to be married before I went there. I had no home of my own, so, of course, I went to his home. It was in the fall of the year, but I don't know the date.

"*Q.* You went there under engagement of marriage; is that it?

"*A.* Yes, sir.

"*Q.* With whom? (Objected to as immaterial. Objection sustained. Exception.)

"*Q.* When did any change take place in that capacity? (Same objection. Same ruling and exception.)

"When I went to Mr. Castaline's, Hattie was there. That was her home. She was about five years old then. That would be in the fall of '92. That was the first time I ever saw Hattie. I lived in Perry something about two years. After going to Perry, I got married.

"*Q.* When was that? (Objected to as immaterial. Objection sustained. Exception.)

"*Q.* Was it within 60 days after your going to Perry? (Objected to as immaterial. Sustained. Exception.)
* * *

"*Q.* Mr. Castaline, I suppose, was a widower, if he had these children, was he?

"*The Court:* This is not material. What materiality is there whether he was or not? (Exception.)

"*Mr. Atkinson:* Suppose it turned out he was a married man?

"*The Court:* Suppose he was a married man; it doesn't affect this case, that I can see. (Exception.)

"*Q.* But for what years, I asked you.

"*A.* Well, I came to Port Huron in 1882,—when I first came to Port Huron. (Objected to as immaterial.)

"*The Court:* What is the purpose of that testimony?

"*Mr. Atkinson:* The purpose is to establish the credibility and search into the antecedents of the witness.

"*The Court:* How do you claim that establishes the credibility?

"*Mr. Atkinson:* It is one of the life circumstances that, if true, the answer will show the witness to be unworthy of credit.

"*The Court:* As to where she lived?

"*Mr. Atkinson:* Where she lived, and who she lived with; and the present question is where she lived. I think if she tells that, that will tell who she lived with. It won't need the next question. If she avoids it, I will have to ask that question.

"*The Court:* What time is that that he is inquiring about?

"*Mr. Walsh:* 1882, 15 years ago.

"*Mr. Atkinson:* I want to search her now, right up to the present time.

"*The Court:* Every place she has been?

"*Mr. Atkinson:* Yes; and who she lived with, and what name she went by, and what men she lived with. ·

"*The Court:* If that is the object, I will sustain the objection. I don't see how that is material. (Exception.)

"*Mr. Atkinson:* For the present, I will take the inquiry as to where she lived only.

"*The Court:* I will make the same ruling on your statement as to what it is for.

"*Mr. Atkinson:* It is for the purpose of giving this jury a knowledge of the antecedents of this witness.

"*The Court:* 'Antecedents' is a pretty broad word.

"*Mr. Atkinson:* I understand, and I understand that is the language of the books; and the cross-examination is instituted for the purpose of getting at the antecedents of the witness, and in that way judging them from it. I use the word because I find it in the works on evidence; but whatever the court thinks about it will be satisfactory to me.

"*The Court:* Am I correct in assuming that it is for the same purpose that you used it before,—to question her moral character?

"*Mr. Atkinson:* If the court will permit me, I will ask it for that purpose.

"*The Court:* I am asking you if it is for that purpose?

"*Mr. Atkinson:* It is for the purpose of testing her credibility now.

"*The Court:* I think I am entitled to a fair answer.

"*Mr. Atkinson:* Your honor ruled that we could not ask it for the purpose of attacking her moral character. Therefore I do not offer it for that, but I offer it for the purpose of showing her incredibility as a witness.

"*The Court:* Then I will sustain the objection. (Exception.)

"*Mr. Atkinson:* And I offer it also to show her identity as the same person who went under different aliases in Port Huron,—different names.

"*The Court:* No; I will not change the ruling. (Exception.)

"*Mr. Atkinson:* Then, as I understand it, I am not to inquire as to where she lived, nor who she lived with, from 1882 up to the present time?

"*The Court* · No, I have not said that.

"*Mr. Atkinson:* Then I will have to ask it, to get the view of the court on it.

"*The Court:* Within any reasonable time, and for any legitimate purpose, you may ask it.

"*Mr. Atkinson:* Well, it is for the purpose of testing her credibility.

"*The Court:* In what way?

"*Mr. Atkinson:* As an untruthful person.

"*The Court:* Does that follow from the places she lived?

"*Mr. Atkinson:* I think so. I think we can show that the places she lived, and the persons she lived with, as affecting her truthfulness, and the circumstances under which she lived with them.

"*The Court:* No, I think not. I am assuming you are offering it for the same purpose you did before; that you are seeking to attack her moral character, and attack her chastity; and I will rule it out.

"*Mr. Atkinson:* Your honor is wrong on that; it is for the purpose of showing she is a person unworthy of credit.

"*The Court:* In what way does it show it, if it is not for that purpose?

"*Mr. Atkinson:* She lived with a man named Smith, and went by the name of Smith.

"*Mr. Walsh:* Wait a moment—

"*Mr. Atkinson:* She bore a child to a man by the name of Smith—

"*The Court:* That is enough. I will sustain the objection. You need not state any more; that is sufficient.

"*Mr. Atkinson:* The thing I was going to state was—

"*The Court:* I don't care for any more; that is enough of it.

"*Mr. Atkinson:* If I cannot learn how far the court desires me to go—

"*The Court:* I am willing you may investigate anything in regard to this woman's character in regard to truth and veracity; anything, so far as her antecedents may be concerned, as far as it bears upon her credibility for truth and veracity.

"*Mr. Atkinson:* Supposing she should deny where she lived, for the purpose of shielding her untruthfulness, and we should be able to show just where she lived.

"*The Court:* I am not ruling on that.

"*Mr. Atkinson:* I am asking for that, if that would not attack her truth and veracity.

"*The Court:* I don't think you can raise a straw man for the purpose of knocking him down.

"*Mr. Atkinson:* I think I am clearly within the correct rule.

"*Mr. McIlwain:* We take an exception to the ruling of the court that we are building up straw men.

"*Mr. Atkinson:* The question passed upon by the court is not this question.

"*The Court:* If I am to take your statement for it, I look at it as the same question.

"*Mr. Atkinson:* As your honor construes my statement, but as I state it it is not that way. Now, then, your honor having passed on it for that purpose, I offer it for the purpose of showing that for six years this woman was a prostitute in Port Huron.

"*The Court:* No; I will rule that out. Anything that is bearing upon that question I will rule it out. You understand, that is fully covered.

"*Mr. Atkinson:* I understand that is fully covered, but the other was not covered.

"*Mr. Walsh:* He should not make such statements. He knows it is false.

"*The Court:* If that is the object, I will sustain the objection. I do not see how that is material. (Exception.)

"*Witness:* Five years ago last fall I went from Detroit.

"*Q.* Was Mr. Castaline at that time a married man, having a wife living there near Perry?

"*The Court:* You needn't answer that. (Exception.)

"*Q.* And the mother of these children? Did you ever work for Mr. McIlwain?

"*A.* Yes, sir. I worked for Mrs. John B. McIlwain in Port Huron. I know Mrs. E. R. Bennett, his mother-in-law. At Mr. McIlwain's I went under the name of Maggie McLaughlin, my maiden name. I was not discharged from there nor from O'Neill's.

"*Q.* Weren't you in the habit of staying out and rooming with young men?

"*The Court:* Now, Mr. Atkinson—

"*Q.* And denying that?

"*The Court:* I told you before that was ruled out, and I don't want any more of it.

"*Mr. Atkinson:* That is ruled out on the ground I put it.

"*The Court:* No; it was ruled out on every ground, and I so stated it.

"*Q.* It was for the denial of it?

"*The Court:* No, it is not proper in any sense. There is no misunderstanding between you and me on that.

"*Mr. Atkinson:* No; but supposing she stayed out for some innocent purpose, and denied it; the denial would be the untruth.

"*The Court:* That is simply subterfuge and nonsense.

"*Mr. Atkinson:* I cannot keep out the other sinful thing, because it is there.

"*The Court:* You cannot work it in, that way now on me, and I tell you that right now; I don't want any more of it.

"*Mr. Atkinson:* I don't want to put in any testimony unless it is within the ruling.

"*The Court:* It must be apparent to a man of your ability that it is simply dodging the main issue, and trying to get it in another way.

"*Mr. Atkinson:* Because this woman is guilty of two sins, I don't see why I cannot show this one.

"*Q.* While working at Mr. McIlwain's, were you not in the habit of staying out nights. for innocent purposes, and then telling falsehoods about it? (Objected to as immaterial, and too remote, and too general.)

"*Mr. Atkinson:* I don't think one sin can shut out another; and, while I know what the Supreme Court has said on one subject, I think it does not entirely shut out the investigation of the character of this. (Objection sustained. Exception.).

" I gave my testimony on the examination in this case, and this is my signature to the testimony given at that time before the magistrate. Neither Hattie nor I were sworn on the inquest. I knew Owen McArron before the 25th of July by sight. He had never delivered milk at my house, and never called for pay for milk, and I never threatened to throw hot water on him if he called again. I don't remember of him ever coming there to threaten that.

"*Q.* So that when you gave your testimony in justice's court you actually did know Owen McArron?

"*A.* I knew·him by sight.

"*Q.* Do you remember testifying in justice's court that you didn't know him the day you gave your testimony in justice's court? (Objected to, unless her testimony, as returned from justice's court, is read. Sustained. Exception.)

"*Q.* Now, I will ask you if at that time and on that occasion this question was asked you and this answer given.

"*Mr. Walsh:* I wish at this time to interpose an objection before the question is asked, as it appears that the question, as far as it has gone, that he is examining from the testimony given at the inquest.

"*The Court:* Do I understand you are asking from the inquest testimony?

"*Mr. Atkinson:* I was only asking it to raise the question and get a ruling. I was in hopes that your honor had learned that I was right, and I am ready to show some authorities. I ask the privilege of asking the question, so as to take the ruling of the court on it.

"*The Court:* You can ask one question from it.

"*Q.* Do you remember Owen McArron being present in justice's court while you were giving your testimony?

"*A.* Yes, sir.

"*Q.* Do you remember him being pointed out to you by Mr. Lincoln Avery, who conducted the examination?

"*A.* Yes, sir; I remember the question.

"*Q.* Now, then, did Mr. Avery ask you this question, and did you make this answer?

"*The Court:* I do not think you should put in the answer. You can ask the question, Mr. Atkinson.

"*Mr. Atkinson:* How are we going to get a ruling?

"*The Court:* That is simply getting it before the jury in another way.

"*Mr. Atkinson:* I will take it whatever way your honor thinks.

"*Q.* Did you ever see this young man before? (Objected to.)

"*Mr. Atkinson:* I ask the privilege of reading her answer, as sworn to at that time.

"*The Court:* I sustain the objection, unless you read the whole deposition to her. I understand it is the returned deposition of the coroner.

"*Mr. Atkinson:* No; it is the deposition in justice's court as taken by the stenographer. It was taken in longhand by the justice, and by the prosecuting attorney's stenographer in shorthand. I am reading from the shorthand report, which is not on file or yet offered in evidence, and not the one returned by the justice.

"*The Court:* I sustain the objection. (Exception.)

"*Mr. Atkinson:* Now, I want to ask another question

from that same thing, and I understand your honor does not desire me to state the answer.

"*The Court:* I do not think you should ask any more questions on that line.

"*Mr. Atkinson:* It is in reference to the description of the young man.

"*The Court:* The ruling will be the same. (Exception.)

"*Mr. Atkinson:* Now I am going to get it on the record.

"*The Court:* You have a ruling on the record as to whether a certain question was asked her outside of the justice's return.

"*Mr. Atkinson:* I want a ruling on the question whether she recognized any person that night resembling this boy.

"*The Court:* You can ask her as to the fact, but you cannot ask her as to her testimony.

"*Mr. Atkinson:* I wanted to ask her if she didn't in that testimony state so and so; state she didn't see anybody there who resembled that boy.

"*The Court:* No; you must read the deposition returned by the justice before you can examine her on it.

"*Mr. Atkinson:* And I put it upon the ground, as I have stated, that the testimony was not all written out by the justice, and it was all written out by the stenographer.

"*The Court:* I think it must be confined to the testimony returned by the justice. (Exception.)

"*Q.* Did you ever live in Sarnia?

"*A.* Yes, sir.

"*Q.* On what street and number did you live in Sarnia? (Objected to as immaterial and too remote.)

"*The Court:* When was this,—before she came to Port Huron?

"*Mr. Walsh:* Fifteen years ago.

"*Mr. Atkinson:* I don't remember; it was some considerable time ago, but I do not think because a person had a bad reputation 15 years ago, and has sustained it ever since, ought to keep it out.

"*The Court:* I will sustain it.

"*Mr. Atkinson:* I mean now for truth and veracity; I want to see her neighbors in Sarnia. I offer it for the purpose of showing who her neighbors were, to impeach her from Sarnia.

"*The Court:* Impeach her in what way?

"*Mr. Atkinson:* For truth and veracity.

"*The Court:* I do not understand that that would impeach her to ask her where she lived.

"*Mr. Atkinson:* No, unless she gave the name.   I am asking her for the names of the neighbors, and then I will call those neighbors.

"*The Court:* I will sustain the objection.   We have been all over it before; it is not for want of information.

"*Mr. Atkinson:* It is for the purpose of getting this record the same as before.

"*The Court:* I think I went too far before; that is the trouble.

"*Mr. Atkinson:* Then I understand that, if it relates to her residence in Sarnia prior to 1882, your honor rejects it.   (Exception taken.)

"*Q.* You say you knew Mrs. Cosgrove?

"*A.* I think not.

"*Q.* Didn't she nurse you at one time during the birth of a child?   (Objected to as immaterial, and sustained.)

"*A.* I don't think I know a person named Mrs. Peavels, near Petrolia, by name.   Perhaps if I saw her I might know her.   I don't think I knew Mrs. Cosgrove.   I was acquainted with Daniel Smith between the years I was 13 and 19 years old.

"*Q.* Where did you live during those years?

"*A.* I lived at home.   (Objected to as too remote. Objection sustained.   Exception.)"

Counsel complain that they were not permitted to show, by the cross-examination of Margaret Castaline, that she was a woman of low character and habits, and contend that they had a right to interrogate the daughter in relation to her father and mother.   This cross-examination was merciless, and it is impossible to read it without regretting that the exigencies of modern trials may be thought to justify such, and wondering that counsel cannot see that they are fraught with more danger to the accused than possible benefit.   Witnesses have rights as well as the accused, and, while thé courts allow an investigation of the character of a witness through cross-examination, there is a broad discretion lodged in the trial court in such matters.   It is understood that these cross-

examinations are condensed in the record. If so, they were very lengthy. These matters were all collateral to the issue, and we think the court was warranted in refusing to allow counsel the latitude that appears to have been insisted upon. The discretion of a trial judge controls the nature and extent of the introduction of collateral matter upon cross-examination, and will never be reviewed, except in cases of abuse, and this will not be lightly inferred. See 1 Greenl. Ev. §§ 446–448. In *Wallace* v. *Railway Co.*, 119 Mass. 91, it was said: "The discretion is not subject to review, unless it is shown to have been grossly and oppressively abused." In *Langley* v. *Wadsworth*, 99 N. Y. 63, the court stated the rule to be that:

" So far as the cross-examination of a witness relates either to facts in issue or relevant facts, it may be pursued by counsel as matter of right; but, when its object is to ascertain the accuracy or credibility of a witness, its method and duration are subject to the discretion of the trial judge, and, unless abused, its exercise is not the subject of review; nor can the witness be cross-examined as to any facts which, if admitted, would be collateral, and wholly irrelevant to the matter in issue, and which would in no way affect his credit."

Nor can the witness be cross-examined as to irrelevant matter, in order to contradict him by showing the contents of a letter written by him. *Com.* v. *Schaffner*, 146 Mass. 512.

The latitude allowed in cross-examination should not ordinarily go so far as to permit the introduction of evidence which has no legitimate relation to any of the issues on trial, and which is at the same time of such a character as to be likely to be applied to them by the jury, and improperly to affect the verdict. *Sullivan* v. *O'Leary*, 146 Mass. 322.

In *Phillips* v. *Inhabitants of Marblehead*, 148 Mass. 329, it was said:

" The extent to which the cross-examination of a witness as to credit may be carried must be left largely to the

judge presiding at the trial, and if matters which are merely immaterial, or which tend to show the reasons of the witness for his opinions, or his fairness of mind, are admitted in cross-examination, there is, as a general rule, no exception."

Referring to the testimony of Margaret Castaline in relation to her testimony in justice's court: Counsel stated that he wished to examine her in regard to matters not contained in her deposition, and that he had a stenographic report of her testimony, aside from the deposition taken by the justice. In short, he claimed that she made statements that were not included in the deposition, and that he had the notes taken by the stenographer. It was objected to, unless her testimony as returned from the justice's court should be read to her. The court sustained the objection. Counsel then asked to read her answer as contained in the minutes, and an objection was sustained. He then said he wished to ask whether in her testimony she did not state that she did not see any one there that night who resembled the boy. The court ruled that the deposition should be read to her first. Counsel then said he wished to ask it, upon the ground that the testimony was not all written out, and the court stated that he must be confined to the testimony returned by the justice. This was a question intended to lay the foundation for impeachment. It had no other purpose. We are of the opinion that the witness should have been allowed to hear her testimony as returned, before answering it. We think that the statement of the court that counsel should be confined to the deposition was open to criticism, for statements not contained in the deposition were none the less her statements, and, like any other statements out of court, might be shown by way of impeachment, subject to explanation, notwithstanding their absence from the deposition. But counsel did not seem willing to permit her to hear her deposition read, and therefore was not entitled to the answer. The propriety of the holding is shown by counsel's own brief; for he states that subsequently the deposition was

read, and contained the statement that she did not know that she ever saw the prisoner before. Moreover, this being introduced, the object of the question was attained. He had the impeaching evidence introduced, notwithstanding his want of the legal foundation.

Dr. Stockwell was asked, on redirect examination, whether he had been able to find a report of any person dying from fright, and he said, "No." This was objected to, but it was a substantial repetition of testimony called out upon cross-examination. We think the learned circuit judge was right in holding that the defendant had no cause of complaint.

Error is assigned upon the failure of the prosecution to call two witnesses who aided in carrying the body home, either before or after death. The prosecutor claimed that they knew nothing about the *res gestœ*, and we do not discover that they had any knowledge of the *res gestœ*. The prosecutor offered to produce them, and that was sufficient. *People* v. *Grant*, 111 Mich. 346.

It was proper for the prosecutor to ask John McArron whether he did not tell his mother that "they had Owen for the trouble at the house." It laid the foundation for impeachment. But, whether proper or not, the answer was, "No," and this did not injure defendant.

We think the court did not err in excluding what Mr. Moore said when John McArron wanted to correct his testimony. The important thing was whether McArron did ask to correct it. Moore was a member of the firm then acting as counsel for the defendant, and his statements were unimportant.

Alice Lovick was sworn on rebuttal, and testified that, on the day after the boy was killed, Mrs. Leach called her, and gave her the pitcher. This witness' name was not on the information. Counsel for the people claim that they had no knowledge of the testimony before the trial, and that, being a rebutting witness, her name need not appear on the information. We can imagine cases where the necessity for rebutting witnesses, and their names, cannot

be known until the defense is made.   Whether, in such a case, the failure to go through the formality of indorsing names, upon leave obtained, is error, may well be doubted. In this instance, she was an impeaching witness.   The reception of the proof, with knowledge of the facts, and against objection, is practically equivalent to an order for an indorsement.   In this case the judge should have permitted the indorsement of this name upon application, if requested.   His ruling indicates that he would have done so.   The case of *People* v. *Durfee*, 62 Mich. 491, is closely in point.   There certain rebutting witnesses were called and sworn.   Their testimony was objected to, when the court ordered their names to be indorsed.   They were not indorsed, however.   This court held the order was sufficient.   Here the court did not make the order, but he did what amounted to the same,—admitted the proof.   There is no merit in the point.

Evidence of good character was introduced on behalf of the defendant, and counsel requested the court to charge that:

"The good character of the defendant is applicable in all cases when crime is charged.   It is not limited to cases where there is an even conflict as to whether the respondent is or is not guilty.   Evidence of good character is admissible, not only in a case where doubt otherwise exists, but it may be offered for the purpose of creating a doubt.   I therefore charge you that the defendant's good character in this case is sustained by a presumption of law, and is also sustained by the unchallenged testimony of his neighbors.   Such a good character may be considered by you sufficient to raise a doubt of his guilt, even against positive testimony."

The circuit judge qualified this instruction, which he gave in substance, by saying:

"It may, under some circumstances, be sufficient, in itself, to raise in the minds of the jury a reasonable doubt; but, in all events, it must be taken into consideration by the jury with the other testimony, and given such weight as they think it is entitled to."

We think this was not erroneous.  Certainly, he should not have told the jury that such evidence should be considered in all cases sufficient to raise a doubt of guilt, even against positive testimony.  That would be equivalent to directing an acquittal.  If not, how else should the statement be qualified than as was done here?

We have examined the arguments of the prosecuting attorney that are complained of, and his conduct of the case appears to have been reasonable and proper, comparing favorably with that of the defense, which we think went to the verge of propriety, at least, in many instances. The inability of the people to review cases which result in acquittal gives an immunity to methods that are indefensible.  Trial courts dislike, upon their own motion, to interfere, lest the defendant be prejudiced, and the result is that the people frequently fail to get a fair trial.  We could easily be specific in this case, were we disposed to be, but we content ourselves with saying that we know of no more justification for departing from a proper practice in defense of a criminal than in any other case, and that trial courts owe it to the public to see that cases are properly conducted, as the learned circuit judge in this instance evidently tried to do.

Twenty-eight requests to charge were offered by the defendant's counsel.  They are, as a rule, lengthy and complicated, and in many instances argumentative.  In some, they appear to state determinations of fact.  Exceptions are taken to the refusal to give all, and we have felt compelled to examine all, although the general charge covers the legal principles contained in most of them. We will allude to such of them as appear to require it. Among the requests were the following:

"3. It is not disputed in this case that the deceased met his death on the night of July 25, 1897; but the important question is, How did he come to his death?  If it can be accounted for on any reasonable theory other than that of defendant's guilt, it is your duty to acquit him.

"4. The defendant, under our statute, is allowed to

testify under oath in his own behalf, and it is the duty of the jurors, where he has done so, to give his testimony such weight as, in view of all the facts and circumstances shown, it shall appear to them to be entitled to.     His testimony is to be tested the same as that of other witnesses. If rational, natural, and consistent, it may outweigh the testimony of all other witnesses."

"7. The prosecution claim that the evidence in this case is made up of a chain of circumstances and facts, or links, so connected together that they lead up, with all reasonable certainty, to the defendant's guilt.     Gentlemen, I charge you that, in order to convict the defendant upon this class of evidence, you must be satisfied beyond a reasonable doubt that each material fact, or necessary link, in the chain, has been proven, and, if you have any reasonable doubt about any one of the material facts, or links, constituting the chain of circumstances, then you should acquit the defendant.     To illustrate, the first material fact or link is death.     That is not disputed.     Second, death by violence by the hands of some person.     That is disputed. Third, death by violence by the hand of the defendant. That is denied by the defendant.     If you have any doubt of whether or not the defendant inflicted any blow on the deceased, then it is your duty to acquit him.     If you have any doubt that the blow claimed to have been inflicted by the defendant was the sole cause of the death of the deceased, it is still your duty to acquit him."

"19. Some evidence has been offered of statements made by defendant at the time of his arrest, and I charge you in relation thereto that such statements at the time of the arrest are to be received with great caution; for besides the danger of misapprehension of witness, or the misuse of words, the failure of the party to express his own meaning, and the infirmity of memory, it should be recollected that the mind of the prisoner himself is often oppressed by the calamity of his situation, and that he is often influenced by motives of hope or fear to make statements."

"22.—(*a*) There can be no conviction in this case unless defendant struck the blow, and there can be no conviction unless the blow caused the death of the Seeback boy.     Upon both these propositions, the prosecution must satisfy you beyond a reasonable doubt.

"(*b*) It is claimed by the defense that the physicians have testified that they did not know what caused Seeback's

death, and, if you find such to be the testimony, it would not do for you to speculate as to what might be the cause, or what was most likely to be the cause, nor can you say his death came from the blow because the doctors were in doubt, or because they may think the preponderance of symptoms point to death from that source. Such speculation may do for the doctors, but you are required to be more certain, definite, and exact in your verdict, and, unless you have certain, definite, and exact convictions from the evidence as to the cause of death, your verdict should be not guilty.

"(c) It is claimed by the defense that medical science is not sufficiently advanced to distinguish between death from fright caused by shock, or death from a blow such as is claimed in this case causing shock, and the defense claim that the doctors are uncertain, undecided, and in doubt. If you find such to be the case, their opinions should not impress you with any greater certainty than they themselves entertain, and, if you find them in doubt, 'the fountain cannot rise higher than its source,' and their doubts cannot create a certainty in your minds."

The learned circuit judge used the following language in his charge:

"In determining whether a person is guilty of manslaughter, it is not necessary to show that he intended to kill the person, or that he had any malice; it is sufficient if it is shown that he did some unlawful act to the person, such as striking him a blow, and death resulted from that blow, without regard to malice, and without regard to intent."

He also said:

"Whenever a man is charged with crime, he is required by the law— The law requires the prosecution to satisfy the jury, beyond a reasonable doubt, that he is guilty of the crime charged, before they can convict him. Now, a reasonable doubt is just what it says,—it is a reasonable doubt; it is a doubt which grows out of the testimony in the case; it is not a mere fictitious or imaginary doubt, but it is a doubt arising in your mind after you have carefully considered all the testimony in the case. If your mind then is in such a condition that you cannot say to a moral certainty that the defendant is guilty, a reasonable

doubt exists in your mind, and you should acquit him. If you have no such reasonable doubt in your mind, under the testimony, then you should convict him.    That is what is meant by a reasonable doubt, and in whatever I may say to you hereafter I want you to bear in mind that it is with the limitation which a reasonable doubt carries with it.    That must be borne in mind, in whatever I may say hereafter, because it will not be necessary for me to keep repeating it.    *    *    *    If, after you have looked this testimony carefully over, you have any reasonable doubt in your mind of this young man's guilt, you should fearlessly say that he is not guilty.    If, on the other hand, you have no reasonable doubt of his guilt, you should just as fearlessly say that he is guilty."

In our opinion, these instructions sufficiently cover the third and twenty-second requests.    The fourth, seventh, and nineteenth state legal propositions which should have been given, and it would have been better to have given, in a modified form, the third and twenty-second also. They all pertain to important subjects, upon which the interests of the defendant require that there should be no misunderstanding by the jury.    It is perhaps probable that he was not injured by the omission, but we cannot be at all certain that he was not.    We feel constrained, therefore, to set aside the verdict, and direct another trial.    It is therefore so ordered.

Montgomery, Moore, and Long, JJ., concurred with Hooker, J.

Grant, C. J. (*dissenting*).    I think that the court clearly and fairly instructed the jury upon every point essential for their consideration.    He gave to them, fully and fairly, the theory of the prosecution and of the defense; instructed them as to the presumption of innocence, reasonable doubt, impeachment and credibility of witnesses.    The court might perhaps, with propriety, have given some of the requests preferred, or the substance of them, but it is not necessary that every conceivable correct proposition should be given to the jury in a criminal case.    It is only

essential that the instructions be such as to properly protect the respondent. It does not follow that, because some court has said in an opinion that the testimony of the respondent in a criminal case may outweigh the testimony of all the other witnesses, it is essential, in every case thereafter tried, that the court should so instruct the jury.

The fourth request was sufficiently covered by the general charge in regard to the credibility of witnesses. I see no reason why the respondent should have been singled out, and attention specially called to his testimony. We are cited to no case which holds that to be essential. The language of the request would apply equally to any other witness. Where conviction depends mainly upon one witness for the people, such an instruction in regard to his testimony would be a correct statement of the law, but such an instruction would sound strange when so applied. The jury were instructed that the weight of evidence was for them entirely. Every juror of average intelligence knows this, without being so instructed, and also knows that he can believe or disbelieve any witness. When one on trial for a crime becomes a witness, and is, by the instruction of the court, placed on the same basis as other witnesses, he has received all the protection in this regard which the law gives him. The same rules of evidence apply to him as to others, and the practice of calling special attention to one witness has been condemned.

I doubt whether the seventh request was specially applicable to this case. There were just two facts to be determined: (1) Did respondent strike the deceased? (2) Did the blow result in death? The illustration contained in the request states the three links. One is conceded, and the other two are summed up in the two questions I have above given. It is manifest from this record that counsel, with ability and energy, argued the two questions to the jury, viz., that the deceased died from fright, and that he was not struck by the respondent. I can conceive of no good purpose to be served by instructing the jury as requested; neither do I think there was any necessity for

such instruction. After devoting nearly a page to stating the theory of the defense according to their testimony, the court said:

"They claim that Owen McArron did not go out upon the street, and did not strike the blow; consequently, that he could not be guilty of the crime that is charged against him here. They also claim that the death of young Seeback may have resulted from the fright caused by Owen McArron's coming to the door suddenly, as he did, at that hour of the evening, and saying what he did to them, or that, perhaps, in his attempting to get away hurriedly, he may have tripped and fallen, and received the injury which resulted in his death; but, in any event, they claim that Owen McArron did not do it."

And again:

" The theory of the defendant is, substantially, that this boy must have lain there upon the street something between 20 to 30 minutes after he was injured before he was found; perhaps it is safer for me to say 15 to 30 minutes. The theory of the prosecution is that he was found immediately after the injury. That is a matter which you must settle from the testimony. If the boy was injured at the time the defense claim, some 15 to 30 minutes before he was found, and Owen McArron did not go out upon that street, and did not strike him, and he was away from there at the time that he was found, he was not at or near the premises, nor immediately before it, if you believe that to be true, it would be your duty to acquit the defendant."

And again:

" If he didn't strike that blow, or if death did not result from that blow, assuming that he did strike him, if death did not result from that blow, it would be your duty to acquit him."

I think that the above instructions, together with others, rendered it unnecessary to give the request preferred.

The testimony to which the nineteenth request is claimed to be applicable is this: Owen McArron testified that he took his cows away to the pasture at 6 o'clock, came back, did the work, and then went to Callahan's. Two officers

met and arrested the respondent on his way back from Callahan's. They testified that respondent said that he had left the house about 6 o'clock, had taken the cows to pasture, had gone from there to Callahan's, and had not been back to the house meanwhile. According to respondent's own testimony, he did not know he was under arrest when he made the statement. The officer had said no more to him than that he wanted him to come down to an inquest; that a boy had been found in front of a new house, and that "I was with him." He further testified that he did not think he was then under arrest. In the light of this testimony, was there any occasion to give the nineteenth request? I think not. The respondent was defended by astute and able counsel, who exerted every means known to the law in behalf of their client. They were given a wide latitude in the examination and cross-examination of witnesses. Every witness who could throw any light upon the transaction was produced, and I find nothing upon the record to indicate that the respondent was not given a fair and impartial trial.

I think that the requests numbered 3 and 22 were sufficiently covered by the oral charge.

The conviction should be affirmed.