75   21
105  113
75   21
134  635

## THE PEOPLE v. JAMES STEWART.

*Criminal law—Statements of respondent—Reasonable doubt—Circumstantial evidence—Charge to jury.*

1. *Prejudicial* statements or admissions made by a prisoner at a time and under circumstances well calculated to disturb his judgment and prudent action, and to unduly excite his fears, even if innocent, which conditions are the *natural* effect of the course pursued by the officers in charge, are not admissible as evidence against him.
2. *Held,* that respondent's first, second, and third requests should have been given, for reasons stated in the opinion.
3. On the trial of a respondent for murder, it is competent for the people to show where he went after he had testified before the coroner's jury, and before his arrest.
4. In the absence of direct proof of the cause of death in a homicide case, if such fact can be accounted for upon any reasonable theory other than that of the respondent's guilt, the jury should acquit.

Error to Lenawee.  (Lane, J.)  Argued January 29, 1889. Decided June 7, 1889.

Respondent was convicted of murder.  Judgment reversed, and prisoner admitted to bail in the sum of $1,000.  The facts are stated in the opinion.

*Grant Fellows,* for respondent.

*D. B. Morgan,* prosecuting attorney, for the People.

SHERWOOD, C. J.  The respondent in this case was charged with the murder of James Hall, and was tried for that crime in the Lenawee circuit court at the November term, 1887, and the jury disagreed.  He was again tried at the February term, 1888, and convicted of murder in the second degree, and sentenced to imprisonment at Jackson for the period of eight years.

The respondent asks for a review in this Court of the proceedings under which he was convicted.

The record includes a bill of exceptions containing all the testimony, and which shows the conviction was had upon circumstantial evidence. In many of its features the case is a peculiar one.

It appears that on the third day of October, 1887, Hall came to the village of Hudson, and was seeking work upon a railroad then being constructed through the village. In the evening of that day he visited several saloons and restaurants, and became intoxicated. He spent some money at several of these places; and, while he claimed to have plenty of money, very little was exhibited.

Hall engaged lodgings for the night at the Rodney House, and paid, in advance for the same, 25 cents. Mr. Witherell was proprietor. He then wandered about the village in the afternoon, smoking and drinking at saloons; and a portion of the time in the evening he was followed by two boys by the name of Cosgrove and Moriarty. They were about 17 years old. Moriarty first saw Hall in the evening about 7 o'clock near Montgomery's saloon,—passed him on the walk; and next saw him at the corner of Main and Market streets near Mr. Lawrence's store. Cosgrove was with him. They all went into the Rodney House. This was about 10 o'clock at night. Hall was so drunk then that Mr. Witherell did not want to keep him over night, and paid him back his money he had advanced for his lodging, and directed him up through an alley near the Rodney House, and there he went into a shed. He was driven out of this place by a Mr. Spalding, who led him out on Market street. The boys then followed him, and, when he got along near Lawrence's corners, the two boys were met by the respondent, and the three went down near where Hall then was, and followed him. He went staggering along, and when they caught up with him Stewart told him he was the marshal, and took hold of him,

and one of the boys took hold of his hand, and turned him back the other way, which he continued until they got to the corner, where they claim Stewart told him he was not an officer, and was only fooling with him. They then went with him up through an alley about 15 rods to an old building in the rear of a furniture store. The building was about 12 feet square, and contained some bed slats and shavings, or excelsior, from which Moriarty and Stewart prepared a place for Hall to lie down upon, and he went in and laid down. The three claim that they then left him for the night with the door to the building or shed open, and never saw him again alive.

Between one and two o'clock the shed was discovered to be on fire; and upon an examination of the premises, as soon as it could be done, it was discovered that the dead body of Hall was among the *debris*, charred and disfigured by the fire.

The *post mortem* examination disclosed that, when the body was found, it laid upon the right side with a hole in the left temple made by some blunt instrument. The fracture in the skull was an inch and a half wide, by two inches long. By the side of the body when discovered laid an iron bar, the end of which compared favorably with the wound in the head. It was a bar that was kept in the shed, and was in there the night before. The physicians swore that the wound might have been made in the head in various ways.

At the time of the fire, Moriarty lived with his parents in the town of Wright, in Hillsdale county, but was then stopping in Hudson, and at work on a railroad.

Cosgrove then lived in Hudson, and was a clerk in a drugstore.

The respondent, when charged with the crime of killing Hall, protested his innocence, and has always asserted it.

The foregoing facts, with some contradictory statements alleged to have been made by Stewart to the officers and

others, were the evidence principally relied upon for conviction by the prosecution.

It is a little difficult, from the record or briefs in the case, to ascertain the theory of counsel for the people, beyond that the respondent was the last person seen with Hall before he died, and that the former had the opportunity to commit the crime charged.

It is not shown that respondent had any ill will towards Hall when alive, or that Hall was in the possession of money, or had anything else that Stewart wanted, or that would furnish a motive for the killing. It would appear to be claimed that, not only did the respondent do the killing, but subsequently set the building or shed on fire. There may be some question whether the court should not have directed the verdict in the case. We, however, inasmuch as there has been a verdict against the respondent, will consider the case as presented by the record, assuming it was a proper one for the jury to pass upon.

We think the fact that the homicide was committed in Lenawee county was sufficiently proved, and no error was committed in so ruling.

Charles M. Croswell was reporter for the Adrian Times, and had a conversation with the respondent at the Lake Shore depot in Adrian while he was in the officer's custody.

The same officer had arrested the respondent, and had several previous talks with him in regard to the homicide, and Stewart's connection with it. When respondent was brought before the magistrate, the officer, who was a deputy-sheriff, said to him:

"Now, Jimmie [meaning Stewart], you have been lying to me. * * * I do not want you to open your mouth unless you tell me the truth; do not say anything."

The officer testified that Stewart made the remark, twice:

"I did not strike the blow."

Mr. Carson, who was the justice who issued the warrant for respondent's arrest, was present at this conversation between the deputy-sheriff and respondent, and states, also, that the deputy told the respondent he had better tell the truth; that it would be better for him, or words to that effect; that Stewart made no statement until the officers asked for it.

"They told him they knew that he had been lying; that they had got evidence that he had been lying to them; that they had ascertained that he had lied as to his whereabouts in accounting for himself during certain hours of the night of the fire; and that he had better tell the truth; that it would be better for him."

That at this time there was an officer upon each side of him; and then they said to him:

"We know you have been lying to us now; we do not want you to lie any more. * * * If you cannot tell the truth, keep your mouth closed."

That he then said:

"I have told you."

That one of the officers said:

"No, you have not told us the truth; we know better. * * * We have seen your mother, and Mrs. De Long's testimony contradicts it. You said that you were at your mother's; that you were in bed at your mother's that evening."

That Mr. Stewart immediately spoke up, and said:

"I did not say I was to bed. I merely said I was there."

That the officers then said to him:

"We do not want any more of that. We want you to tell us, and connect yourself through from the beginning to the end with the transaction,—all you know about it."

That respondent then said:

"Well, if you send me up for ninety-nine years, I did not kill the man. * * * I did not strike the blow."

It further appears that, at the time of the conversation with the reporter, respondent did not know him, or that he intended to use it against him, or that he was a reporter, but respondent supposed him to be a lawyer. Respondent had neither employed nor consulted with a lawyer at that time.

The conversation related to the transaction, and what respondent knew about it, and what part he took in the evening's proceedings when the alleged homicide occurred; and, to that end, the counsel for the people asked the witness to state what the conversation was.

Counsel for respondent made the following objection to the question:

"I object to that as incompetent. There is no showing that the statement was voluntary; and I believe the people must show that the statement was voluntary, and that no inducement had been offered either at this time or at any prior time.

"The burden is upon them to show that the statement was voluntary. If any inducement has been offered at any prior time, they must show that the effect of this inducement has been wiped out, either by statements to the prisoner that it could not be used against him, or by something else.

"My position is that, from the time the defendant was arrested until this statement was made, there must be proof that no statement was made to him which would render his statement involuntary."

It is true the witness stated there was no inducement held out by him to respondent to make the statement; that nothing was said to him as to whether he ought to make a statement or not; and that witness did not know what the officer had said to the respondent. The witness was then permitted to state what the respondent there said to him while in the custody of the officers, and under their control, and after the conversation had with them as hereinbefore narrated, and against the objection of respondent's counsel.

Similar statements were allowed to be given in evidence by the justice later on in the case, and afterwards, on motion of defendant, were stricken out, on the ground that only such portions of the statements were allowed to be made as suited the officers, and, when any others were attempted to be made by the respondent, he was told he lied, or that he must stop that kind of talk.

The respondent's counsel, at the time this ruling was made, again called the attention of the court to the statements given in evidence by witness Croswell, and asked to have them stricken out.

We think the objection to the admission of Croswell's testimony was well taken, and that the motion subsequently to strike it out should have been granted. They were made at a time and under circumstances which were well calculated to greatly disturb the judgment and prudent action of the respondent, and to unduly excite his fears, even if innocent; and such feelings were but the natural effect of the course pursued by the officers having him in charge. And the effect of what they did and said and induced the prisoner to say was to his prejudice before the jury. It is, indeed, quite manifest that without this testimony a conviction could not have been obtained, and the court erroneously admitted it.

Several requests had been prepared by the respondent's counsel for the court to charge, and the court was asked to give them to the jury. This was not done. These requests were as follows:

"1. You will start out in the trial of this case with the presumption that the defendant is wholly innocent of the crime charged, and that presumption must be overcome by evidence so convincing that you can say, beyond any reasonable doubt, that the defendant is guilty as charged.

"2. A reasonable doubt is such a doubt arising out of the evidence that you cannot say, to a moral certainty, that the defendant is guilty; and, if there is any other reasonable

explanation of the death of the stranger than the guilt of the defendant, you are bound to acquit.

"3. The prosecution claim that the evidence in this case is made up of a chain of circumstances of facts or links so connected together that they lead up, with all reasonable certainty, to the defendant's guilt. And, gentlemen, I charge you that, in order to convict the defendant upon that class of evidence, you must be satisfied, beyond any reasonable doubt, that each material fact or necessary link in the chain has been proven; and, if you have any reasonable doubt about any one of the necessary facts or links constituting the chain of circumstances, then you should acquit the defendant.

"To illustrate: The first material fact or link is the death; the second, death by violence at the hand of some person. The first fact, the death, is not disputed; the second is contested; and, if you have any reasonable doubt as to either one of them, then you must acquit.

"4. It is claimed by the prosecution that the defendant has made different and contradictory and inconsistent statements concerning his whereabouts for one or two hours immediately before the fire in question. But, even if defendant did make such contradictory statements, and they were partly or wholly false, that of itself would not be sufficient to convict the defendant. And you should very carefully consider what the average young men of his condition of life might do under like trying circumstances; and in this connection you should recall the fact that the young men Cosgrove and Moriarty were both quickly ready to resort to falsehood for the purpose of warding away suspicion notwithstanding their acknowledged innocence. And now, gentlemen, if you should believe that this defendant made contradictory statements, and that some of them, or all of them, were false, it will not be unnatural that such belief on your part may create a prejudice in your minds against this defendant.

"If such should be the case, it will be your duty to exercise great care that you do not permit that prejudice to take the place of and be substituted in your minds for actual evidence and proof of all the necessary and material facts to constitute the chain necessary to establish the defendant's guilt.

"5. As I have said, it is not disputed in this case but that the deceased stranger met his death in the shed in question on the night of the third, or early morning of the fourth, of October last, but the difficult question is, how did he come by his death? Can it be accounted for upon any reasonable

theory other than that he was murdered by this defendant? If it can, then you must acquit the defendant."

We do not think the fourth assignment is well founded. It was sought to show where respondent went, and his conduct, after the coroner's jury had been summoned and he had been examined, before his arrest on the same day, and it was permitted to the people to do so.   We see nothing objectionable in the examination.

The defendant's sixth, seventh, and eighth assignments of error involve the refusal to give the defendant's first, second, and third requests to charge.   It may be said that they were given in substance with much plausibility.  Still, they were not given in the language requested, and there was no reason why they should not have been.

It not unfrequently occurs that, in consequence of the peculiarity of some of the jurors, known to the counsel, he can tell best what particular form of expression will be best understood by them.   This is especially the case where counsel are well acquainted with the jurors, and know their peculiarities of thought, and mode of reasoning and ability to comprehend; and, in a case like the present, where so much depends upon the charge of the court, and the manner in which the charge is given, we think, as we have often said before, the court should give the requests of counsel in the language of counsel, if found correct; and, while it is quite possible the judgment here should not be reversed for these alleged errors, these requests should have been given as requested.  *Cook v. Brown*, 62 Mich. 473 (29 N. W. Rep. 46); *Mynning v. Railroad Co.*, 59 Id. 257 (26 N. W. Rep. 514); *People v. Macard*, 72 Mich. ——— (40 N. W. Rep. 787).

If this may not be required of the court, the rule that counsel may prepare and make such request to charge is of but little or no benefit to the respondent, or in fact to either party in any suit tried by jury.

We think the respondent's fourth request was correctly

refused. It requires the court to pass upon facts which were exclusively for the jury.

The fifth request should have been given, for the reasons already mentioned.

The other questions presented are unimportant, but for the errors noted the judgment must be reversed, and a new trial granted.

With the errors in this record eliminated, a conviction would be highly improbable. But what new facts may have been disclosed since the case was tried, if any, we have no means of knowing; and in any event, if it is thought best to longer hold the respondent for trial, he must be admitted to bail on giving bond for his appearance in the sum of $1,000, to be approved by the circuit judge, with two good and sufficient sureties.

The other Justices concurred.