PEOPLE *v.* QUIMBY.

134    625
137   ¹699

1. CRIMINAL LAW—JURORS—QUALIFICATIONS.

One who has an opinion, formed from reading newspapers, as to the guilt or innocence of the accused, is not disqualified from serving as a juror, where his opinion is not of so positive a character that he could not give the accused the benefit of the presumption of innocence, and render an impartial verdict upon the evidence in the case.

2. SAME—EVIDENCE—CORPUS DELICTI—RES GESTÆ—CONFESSIONS.

Where, on a trial for murder by poisoning, it was shown that the accused had on Saturday purchased morphine and empty capsules, that she had expressed her intention of killing herself and children, that on Monday morning the neighbors found the accused and her children in bed in an unconscious condition, and that boxes containing a white powder and empty capsules, which were identified by the druggist as the ones he · had sold the accused, were found in the house, statements by the accused after regaining consciousness, and before the death of her children, that she had given them morphine, were admissible as part of the *res gestæ*.

3. SAME.

An unsigned paper written by the accused, purporting to give an account of the occurrences at her residence at the time the poison was administered, and making requests as to the funeral, burial, and disposition of her property, was admissible as an admission.

4. SAME—POISON.

It was *held* that the evidence in this case showed that morphine, found by a physician in the stomach of a child, was received into the stomach before the child's death.

5. SAME.

Where, on the trial of a woman for the murder of her daughter by poisoning, the proofs indicated that the poisoning of the daughter and her son was one transaction, evidence that a physician found morphine in the son's stomach was admissible.

6. TRIAL—REQUESTS TO CHARGE.

A trial judge is not bound to follow the exact language of written requests, if they are fully covered by the general charge.

7. SAME—OBSCURE CHARGE.
    A case will not be reversed because a portion of the charge is obscure, if other parts of the charge, in the same connection, make the subject clear, and state the law applicable to the case correctly.

8. NEW TRIAL—CUMULATIVE EVIDENCE—ERROR.
    The denial of a motion for a new trial, based on newly discovered evidence which was purely cumulative, was *held* not to be error.

Error to Gratiot; Stone, J. Submitted June 12, 1903. (Docket No. 151.) Decided November 3, 1903.

Sarah Quimby was convicted of murder in the first degree, and sentenced to imprisonment for life in the State prison at Jackson. Affirmed.

*John T. Mathews*, for appellant.

*Charles A. Blair*, Attorney General, *M. R. Salter*, Prosecuting Attorney, and *Julius B. Kirby*, Assistant Prosecuting Attorney, for the people.

MOORE, J. The respondent was convicted of murdering, on the 20th of May, 1901, Beatrice Bailey, nine years old, a daughter by her first husband. She was sentenced to imprisonment for life. The theory of the prosecution was that Beatrice came to her death from the effects of morphine poison administered by the respondent with criminal intent. It was the theory of the respondent's counsel that the respondent was insane, and not responsible for her actions; that on the night in question Elmer Quimby, the husband of the respondent, was present when the poison was administered, and administered it, or at least caused it to be done, if in fact Beatrice died from the effects of morphine poison. After the case was tried, a motion was made for a new trial upon the ground of newly discovered evidence, and upon the ground that the court erred in several particulars in his rulings and in his charge.

The motion for a new trial was overruled.   The case is brought here by writ of error.

The respondent exhausted her peremptory challenges, and was not satisfied with the jury then obtained.   She challenged for cause three jurors.   Her challenges were overruled, and, in order to excuse them, she was obliged to challenge them peremptorily.   The first question is, Should the court have sustained the challenge for cause? If the challenge for cause should have been sustained in any of the instances where it was overruled, it was in the case of the juror Sherman.   The record discloses the following:

" *Q.* Then you have an opinion?   What do you mean by a partial opinion?
"*A.* It is not a real strong opinion.
" *Q.* That partial or part opinion?
"*A.* It is abiding with me now.
" *Q.* Fixed and abiding in your mind?
"*A.* Yes.
" *Q.* If you were a juror in this case, you would start in in the trial with that opinion now?
"*A.* I could not help it.
" *Q.* It would take evidence to break that opinion, would it not?
"*A.* Yes, certainly."

On the cross-examination he said:

" *Q.* You say that that is a partial opinion?
"*A.* It is.
" *Q.* You mean you have an impression or opinion formed by reading?
"*A.* That is it exactly.
" *Q.* An impression as to the guilt or innocence of the defendant?
"*A.* Yes.
" *Q.* What do you say about whether you could lay aside that impression you have formed, and could, upon the evidence given here in court, base your verdict solely upon the evidence, and render a verdict in accordance with it?
"*A.* I think I could.
" *By the Court:   Q.* Did you ever talk with any one

who claimed to know—have personal knowledge of—any of the facts?

"*A*. No, sir.

"*Q*. All you ever heard or have known about it, whatever, is what you have read in the newspapers?

"*A*. Yes.

"*Q*. Can you recall how many papers you read that in?

"*A*. I think it was two, the News and Free Press.

"*Q*. Did that statement purport to give a detailed statement of it, or was it a mere mention of the matter? I understand that newspaper account didn't make a sufficient impression on your mind so that you can now recall what you did read about it?

"*A*. Why, certainly.

"*Q*. You can't now remember what you read?

"*A*. No, I cannot.

"*Q*. That didn't make enough impression upon your mind—that newspaper article—so that you can now recall what you read?

"*A*. No, it didn't. It has been quite a spell ago.

"*Q*. But you remember reading about it?

"*A*. Yes.

"*Q*. And you remember that reading made some impression on your mind?

"*A*. Upon my mind, yes.

"*Q*. Would that impression be such that it would embarrass you in any way from giving the defendant the presumption of innocence, and starting in with the presumption of innocence clear through the trial, and rendering a fair and impartial verdict upon the evidence introduced here, and the charge of the court? Would you be embarrassed in any way in that by that impression?

"*A*. I think not.

"*The Court:* I think the challenge may be overruled.

"*Mr. Leet:* Mr. Sherman, you say that you now have an opinion in reference to the guilt or innocence of the defendant in this case?

"*A*. That is what I said.

"*Mr. Leet:* We challenge him for cause

"*The Court:* Overruled."

It is said by counsel for respondent that the case is controlled by *People* v. *Thacker*, 108 Mich. 652 (66 N. W. 562). It must be confessed the case now under consideration is near the border line, but we think it distinguish-

able from the case of *People* v. *Thacker*.  In that case
the juror had talked with Mr. Waterbury, a member of
the jury which was impaneled by the coroner, who
claimed to state the circumstances of the case, and the
juror believed what Mr. Waterbury stated was true.  In
the case at bar the juror talked with no one who had per-
sonal knowledge of any of the facts connected with the
alleged crime.  In *Holt* v. *People*, 13 Mich. 228, it is said:

"To require that jurors shall come to the investigation
of criminal charges with minds entirely unimpressed by
what they may have heard in regard to them, or entirely
without information concerning them, would be, in many
cases, to exclude every man from the panel who was fit to
sit there.  With the present means of information, the
facts or rumors concerning an atrocious crime are, in a
very few hours, or days at the farthest, spread before
every man of reading and intelligence within the district
from which jurors are to be drawn, and over the whole
country if the atrocity be especially great.  And there are
some crimes so great and striking that even the most
ignorant will have information and impressions in regard
to them; and the rule, as stated, applied to such cases,
would render the impaneling of a jury for their trial impos-
sible, and make their very enormity a complete protection
from punishment.

"Without attempting or desiring to lay down rules for
all cases, it is sufficient for us to say that the showing in
the present case falls far short of establishing cause for
challenge.  The juror is shown to have formed a partial
opinion, but not a positive opinion.  This opinion was not
based upon anything he had himself witnessed, or from
information derived from those who claimed to know the
facts, but upon street rumors.  Now, when a person says
he has formed, from street rumors, a partial, but not a
positive, opinion, we think he is to be understood as speak-
ing only of those impressions which every one receives in-
sensibly when a charge of crime is made, but which, so
far from amounting to settled conviction, do not in the
least preclude an impartial examination of the facts when
afterwards presented in the form of legal testimony.  We
understand him to speak of that class of impressions which
were held by Chief Justice Marshall to be no ground for
excluding a juror:  'Those light impressions, which may

fairly be supposed to yield to the testimony that may be offered,' and 'which may leave the mind open to a fair consideration of the testimony;' not of 'those strong and deep impressions, which will close the mind against the testimony that may be offered in opposition to them, which will combat that testimony, and resist its force.' 1 Burr's Trial, 416. See, also, *Osiander's Case*, 3 Leigh, 785 (24 Am. Dec. 693); *Smith* v. *Eames*, 3 Scam. 78 (36 Am. Dec. 515); *Bradford* v. *State*, 15 Ind. 351; *State* v. *Potter*, 18 Conn. 174, 175."

See *Stephens* v. *People*, 38 Mich. 739; *Ulrich* v. *People*, 39 Mich. 245.

In *People* v. *Barker*, 60 Mich. 277 (27 N. W. 539, 1 Am. St. Rep. 501), it was said:

"The opinion entertained by a juror which disqualifies him is an opinion of that fixed character which repels the presumption of innocence in a criminal case, and in whose mind the accused stands condemned already. It is not because it will require some evidence to remove impressions or opinions formed from rumors, newspaper statements, or from whatever other sources these impressions may have been received, that a juror is disqualified. The sources of information are important in determining the effect likely to have been produced upon the mind of the juror, and the influence likely to be exerted upon his judgment; but the human mind is so constituted that impressions made upon it which lead towards certain conclusions, whether reached or not, will always require other impressions to be made to eradicate the former ones, or to lead towards different conclusions; in other words, will require some evidence to remove them. We all are conscious that notions entertained by us are not all of the same stable character, and range all the way from conviction, which is the ultimate effect of ratiocination, to the passing comment or idle words that leave no permanent impression. The question, therefore, must be always one of degree, and the trier is called upon to determine whether the opinion entertained by the juror is of that fixed or permanent character which disqualifies him from coming to the case in a fair, candid, and impartial frame of mind, which is unaffected with prejudice or favor to either party."

In the case of *People* v. *Foglesong*, 116 Mich. 556 (74

N. W. 730), this question was under discussion. The court referred to the case of *People* v. *Thacker,* and held that, while a proper result was reached in the case, some of the language used therein was not a correct statement of the law. The court also used the following language:

" It is not possible for a murder to be committed without it being the subject of wide-spread comment, and it becomes the subject of many newspaper articles, so that wideawake and intelligent men, who read newspapers, are almost sure to learn something of what is claimed in relation to whether a crime has been committed or not, and who committed it. It is not desirable that the rule in relation to the competency of jurors should be so fixed that only the ignorant and unfit can do jury service in these important cases. On the other hand, the accused is entitled to be tried by jurors who are not biased, and who do not have such fixed opinions of his guilt as will preclude them from acting impartially in his case. In addition to the cases cited, see *Holt* v. *People,* 13 Mich. 224; *People* v. *Barker,* 60 Mich. 277 (27 N. W. 539; 1 Am. St. Rep. 501). We do not think the court erred in overruling the challenges to the proposed jurors."

We think it a fair inference from what was said by the juror that what he read in the newspapers created in his mind an impression as to the guilt or innocence of the accused, but that the impression was not of such a fixed character that the juror could not give the respondent the benefit of the presumption of innocence, and render an impartial verdict, based upon the evidence in the case. The statute (3 Comp. Laws, § 11947) reads as follows:

"*The People of the State of Michigan enact,* that the previous formation or expression of opinion or impression, not positive in its character, in reference to the circumstances upon which any criminal prosecution is based, or in reference to the guilt or innocence of the prisoner, or a present opinion or impression in reference thereto, such opinion or impression not being positive in its character, or not being based on personal knowledge of the facts in the case, shall not be a sufficient ground of challenge for principal cause to any person who is otherwise legally qualified to serve as a juror upon the trial of such

action: *Provided,* the person proposed as a juror, who may have formed or expressed or has such opinion or impression as aforesaid, shall declare on oath that he verily believes that he can render an impartial verdict according to the evidence submitted to the jury on such trial: *Provided,* further, the court shall be satisfied that the person so proposed as a juror does not entertain such a present opinion as would influence his verdict as a juror."

The juror was within the terms of the statute, and we think the judge did not err in his rulings.

Error is assigned because the court admitted testimony of what the respondent stated in the morning of the day the little girl died. It is necessary here to state what was shown by the people's witnesses. The respondent had a son, James Bailey, who was about a year younger than Beatrice. The two children and the mother had lived on a 40 acres of land with the husband of Mrs. Quimby. The husband and wife quarreled, and it is claimed Mr. Quimby was unkind to the children, and desired to be rid of them. It was shown that, on Saturday previous to the death of the little girl, Mrs. Quimby purchased a box of morphine and some empty capsules; that she had expressed to at least one witness the intention of killing herself and her children. On the morning of May 20th Mr. Quimby called the attention of some of the neighbors to the fact there was crape on the door where Mrs. Quimby lived. The neighbors, accompanied by Mrs. Odell, the mother of Mrs. Quimby, who stopped with them for the night, went to the Quimby residence, where they found Mrs. Quimby lying in bed, clothed in her nightrobe, and apparently unconscious. By her side was Beatrice, also in her nightrobe and unconscious. James, also in his nightrobe, was upon a couch in an adjoining room, also unconscious. Some boxes were found in the buttery, in which was a white powder, and some capsules were also found. These boxes and capsules were afterwards identified by the druggist as the ones delivered by him to Mrs. Quimby, and the powder was shown to be morphine. Mrs. Odell and the neighbors at once attempted to revive

Mrs. Quimby and the children. In the case of Mrs. Quimby their efforts were successful, and she was soon about the house. The prosecuting attorney and a doctor and others soon arrived, and efforts were continued to revive the children, who were still alive, though unconscious. These efforts were unavailing, and about 10 o'clock both of them died, one a few minutes after the other. After Mrs. Quimby had recovered consciousness, while both the children were living, she stated, in response to a question by one of the neighbors, the children had had morphine. She also stated the little girl threw it up about 4 o'clock, and she gave her some more. The doctor, who arrived before the children died, testified that, judging from the symptoms and what he saw of the children, they were suffering from poisoning by morphine or opium, and were so far gone as to be beyond all help, and died within 15 or 20 minutes after his arrival. After the prosecuting attorney arrived, he had a talk with Mrs. Quimby, in which she told him she was a murderess, and asked not to be arrested until after the children were buried. It is claimed the court erred in allowing testimony to be given of the statements of Mrs. Quimby, for the reason that the *corpus delicti* had not been proven outside of her statements. These conversations occurred during the progress of this horrible tragedy, and were a part of it. They constituted a part of the *res gestæ*, and were admissible. See *Sullivan* v. *State*, 58 Neb. 796 (79 N. W. 721).

In this connection we may as well dispose of the assignment of error alleged because of the admission of an unsigned paper, which, upon the day in question, was delivered by Mrs. Quimby to her mother, who caused it to be delivered to the prosecuting attorney. The paper purported to give an account of the occurrences of the night at the Quimby residence, and made requests as to the funeral and burial and disposition of Mrs. Quimby's property. The letter was shown to be in the handwriting of

Mrs. Quimby. It was admissible as in the nature of an admission by her.

Upon the trial Dr. Vaughan was allowed to testify that he had analyzed the contents of the stomach of James, and found morphine therein. It is said this was inadmissible, *first*, because it was not shown the morphine entered the stomach before death; and, *second*, that it was not competent in a case where the respondent was charged with the death of Beatrice. It is true the doctor stated he could not tell, from his analysis, when the poison entered the stomach, but that was not conclusive. His testimony was only part of the people's case. In addition to what we have already mentioned, it was shown the bodies were embalmed by an undertaker, were later buried, were afterwards exhumed, the stomachs removed, sealed up in glass jars, and delivered to Dr. Vaughan. It was also shown that the grave was undisturbed until the bodies were exhumed, that there were no marks upon the bodies except the incision made by the trocar in injecting the embalming fluid, which fluid contained arsenic, but no morphine. Under this state of facts, instead of there being no proof that the stomach received the morphine before death, we think the proof is very convincing it was received before death.

Was proof of the contents of the stomach of the boy competent evidence as bearing upon the question of what caused the death of the girl? The children were brother and sister, of nearly the same age. They were in good health on Saturday. Early Sunday morning they were found in the presence of the mother, who the day before bought poison. They were unconscious, and were suffering in the same way, with symptoms indicating morphine poisoning. They never recovered consciousness, but the symptoms of morphine poisoning continued until they died, within a few minutes of each other. The proofs indicated the poisoning of both children was one transaction. We think the evidence was competent. See *People* v. *Foley*, 64 Mich. 148 (31 N. W. 94).

Complaint is made of the failure of the court to give the requests of counsel for the respondent, and of the charge as given.    It is said:

"By section 10244 of Miller's Compiled Laws, parties are at liberty to request the court to charge upon questions of law.    By section 10246, 'the instructions   *   *   *   so settled   *   *   *   shall be read to the jury,   *   *   *   and the court shall in no case orally qualify, modify, or in any manner explain the same to the jury.'    Under the above-mentioned sections, and section 10243, this court held in the case of *Cook* v. *Brown*, 62 Mich. 473 (29 N. W. 46, 4 Am. St. Rep. 870):

"'Where requests are based on correct principles of the law, and in clear, terse, and comprehensive language, to be easily understood by the jury, it is not only proper, but the duty of the court, to give the requests in the language presented.'

"See, also, *People* v. *Stewart*, 75 Mich. 21 (42 N. W. 662)."

A reference to the note under section 10246, 3 Comp. Laws, will show its provisions are not applicable where a stenographer is employed.    In the two cases cited by counsel, the opinions were prepared by Justice SHERWOOD, and in them language is used which justifies the contention of counsel.    It, however, has been repeatedly held, and we understand it to be the law, that the trial judge is not bound to follow the exact language of the written requests, if he properly states the law as applicable to the evidence and the several theories of the case as presented by counsel.    See *Wright* v. *Irwin*, 35 Mich. 347; *Keables* v. *Christie*, 47 Mich. 594 (11 N. W. 400); *Ulrich* v. *People*, 39 Mich. 245; *Joslin* v. *Le Baron*, 44 Mich. 160 (6 N. W. 214); *People* v. *Sligh*, 48 Mich. 54 (11 N. W. 782); *Power* v. *Harlow*, 57 Mich. 107 (23 N. W. 606); *Alton* v. *Meeuwenberg*, 108 Mich. 629 (66 N. W. 571). We think such of the requests to charge as should have been given were fully covered by the general charge.

We have already said it is claimed that, upon the night in question, the respondent was insane, and not responsi-

ble for her acts. As bearing upon that question, evidence of her acts and conversation before and after May 20, 1901, was given. Testimony was also given to the effect that the father and brother of the respondent were insane, and committed suicide, and that earlier in the history of her family there had been insanity in it. The court charged the jury upon the question of insanity, and error is assigned upon that portion of it reading as follows:

"Now, if the respondent in this case, by reason of an abnormal desire to commit suicide, inherited from her ancestors, was unable to resist the impulse to do so, with knowledge of the wrong she was committing by killing the children, took their lives voluntarily because she did not wish to leave them living at her death, then she cannot avoid the responsibility because the crime was brought about by an inherited tendency to suicide."

Taken by itself, this language may be somewhat obscure, though we get from it the idea that, even though the jury find that the respondent, because of inherited tendencies, could not resist the impulse to commit suicide, even then, if she voluntarily killed her children, knowing it to be wrong, she could not avoid responsibility for the act. When this portion of the charge is read in connection with the rest of what the judge said upon that subject, we think it is made very clear. He said:

"If she knew right from wrong, and at the time of the act she had by mental disease so far lost the power to choose between right and wrong that her free-will agency was at that time destroyed, and the criminal act was so connected with such mental disease as to have been the sole cause of it, then the respondent would not be responsible, and your verdict should be 'Not guilty,' because of insanity. So, gentlemen, the question is not whether the respondent's mind was natural or unnatural. It is not whether her mental faculties were impaired or unimpaired. The only question is, If she administered morphine to those children with intent to cause their death, did she, at the time of doing it, know it was wrong to so kill them, and could she have refrained from doing it if she had chosen to do so?  *  *  *

"Now, evidence has been introduced here tending to show that the father and brother of this respondent committed suicide. Suicide, of itself alone, is not evidence of insanity. It may be considered together with other facts and circumstances in determining the question of sanity, and the question of insanity is to be considered in determining the question of responsibility for crime. A person may inherit from his ancestors a kind of insanity which would deprive him of the power to choose right from wrong; and, if such a person is charged with crime, it is of the very greatest importance to ascertain such inherited tendency, to determine whether the person is responsible for the crime. On the other hand, a person may inherit from his ancestors an exceedingly gloomy, despondent temperament and disposition, and a tendency to fits of despondency and melancholy so deep and so protracted as to naturally lead to suicide; and such inherited tendency, though affecting the mind, and rendering it abnormal, would not, of itself, be evidence that the person did not know right from wrong, and was not responsible for taking the life of another."

Then follows that portion of the charge which we have already quoted. Following that the judge charged:

"Every person is presumed to be sane until the contrary is shown. If no evidence of insanity had been given, then you would presume the respondent to be responsible for her acts. When evidence is introduced upon that question, then the question of whether or not the respondent is responsible for her act becomes a question for you to determine from all the evidence bearing upon it; and if, after carefully considering all of such evidence, there should remain any reasonable doubt as to whether or not she was responsible, then your verdict should be 'Not guilty,' because of insanity. If, on the other hand, you find beyond a reasonable doubt that the children were killed and murdered by poison by the respondent, and the evidence convinces your minds so that you have no reasonable doubt that she was responsible for her act under the rules I have given you, then your verdict should be, 'Guilty of murder in the first degree.'

"In determining this question, consider carefully all the facts bearing in any manner upon it. Did she inherit insanity from her ancestors? If so, what was the nature of such insanity? What has been her life and habits and

surroundings, as disclosed by the evidence? What has been her physical condition, and how has that been affected by her life and habits? Consider what her friends and neighbors have discovered in regard to her actions as tending to show whether or not she is sane or insane. Consider the testimony of the doctors who have examined her, and their opinions on the subject. What opportunity did the doctors have to obtain knowledge upon which to base an opinion? Consider carefully her actions just before and at the time of the committing of the crime. Did she do any act preparatory for the committing of the crime? If so, look carefully to see what it was. How was it committed? Did she make a statement in writing during that Sunday night? If so, look into it. Does it indicate that she was at that time irresponsible, or does it indicate to the contrary? Consider her statements the next morning, if she made any, and all her statements and conduct since her arrest, so far as they are disclosed by the evidence; and from all these, and any other evidence that I have not referred to touching the question, determine whether or not on that Sunday night the respondent was such a woman as should be held responsible for the crime with which she is charged."

We do not think the jury had any difficulty in understanding the meaning of the court.

As before stated, the judge overruled the motion for a new trial. This motion was based upon alleged errors which had occurred during the progress of the trial, and particularly because the only surviving sister of the respondent had since the trial become insane. In giving his reasons why he refused a new trial, the circuit judge said, among other things:

" The respondent gave evidence in her defense as to the insanity of her father and other of her relatives, and the same was submitted to the jury by the court. The fact that one of respondent's sisters, since the trial of this case, had been adjudged an insane person, while tending to make the taint of insanity in respondent's family more marked, is only indirect evidence as to the mental condition of the respondent at the time of the commission of the crime. The fact would still remain that the best and most satisfactory evidence of the mental condition of

respondent at the time of the commission of the offense is her actions and conduct at and about the time in question."

Proof of the insanity of the sister was testimony of the same character as proof of the insanity of the father and brother, and was cumulative testimony. We cannot say the judge erred in refusing to grant a motion for a new trial.

There are 40 assignments of error. We cannot discuss all of them, though they have all had our attention. We have discussed such of them as to us seemed important. The case is an important one, and was well calculated to produce a high degree of excitement. We are impressed with the idea that the court and its officers attempted to accord to the respondent a fair and impartial trial, which attempt was successful.

Judgment is affirmed.

HOOKER, C. J., GRANT and MONTGOMERY, JJ., concurred. CARPENTER, J., did not sit.