PEOPLE *v.* HAMMOND.

1. Larceny—Criminal Law—Evidence of Identity.
   If, from the opportunity of a witness to identify respondent, who was charged with the larceny of an automobile, her opinion was of value, it could properly be received: having seen respondent and had a good opportunity to judge of his appearance, the witness might be permitted to testify that the accused looked like the same person who had the automobile.

2. Criminal Law—Evidence—Admissions.
   Testimony of reputable witnesses, in a larceny case, that they suspected the respondent was a thief, and charged him with having committed a theft, was harmful and erroneously received, though they also testified that he denied the accusation.

3. Same—Impeachment.
   Testimony relative to such conversation, which respondent stated he did not recollect, was not made competent by his failure to remember, since it is not permissible to impeach a witness by evidence of immaterial facts.

4. Witnesses—Impeachment—Secondary Evidence.
   A witness for respondent, having testified that he worked for a railroad company about two or three years at different times, could not be impeached by introducing in evidence records of the company not shown to be complete or correctly kept.

5. Criminal Law—Charge—Reasonable Doubt.
   Refusal of the court to charge that each member of the jury must be convinced of respondent's guilt beyond a reasonable doubt, *held*, not erroneous under instructions that fairly covered the question of reasonable doubt.

6. Same.
   But the court erred in refusing to give a request that respondent's testimony was to be tested like the other witnesses, and if rational, natural, and consistent, might outweigh the testimony of all others; the point not being covered by the charge and no instructions being offered as to the weight or credibility of testimony.

Error to the recorder's court of the city of Detroit; Connolly, J. Submitted June 13, 1913. (Docket No. 123.) Decided October 10, 1913.

Chauncey W. Hammond was convicted of larceny. Reversed.

*Grant Fellows,* Attorney General, *Hugh Shepherd,* Prosecuting Attorney, and *Paul W. Voorheis,* Assistant Prosecuting Attorney, for the people.

*William J. Weakley,* for respondent.

KUHN, J. The respondent was convicted in the recorder's court of the city of Detroit of the larceny of an E-M-F automobile of the value of $1,200 and was sentenced to the State prison at Jackson, where he is now confined, for a term of not less than 2½ years, with a recommendation of the maximum of 5 years. The automobile was taken from in front of the Fine Arts Building in the city of Detroit on the evening of the 31st day of May, 1911, and was found on June 12th following in the possession of the respondent and William Fraser, in the city of Columbus, Ohio, at which time they were arrested.

One Joseph Du Gaw testified that on the 1st day of June, 1911, the respondent called him by telephone and asked him for the privilege of putting an automobile, which he said he had, in a shed back of Du Gaw's residence and Du Gaw gave him permission so to do. Du Gaw was not at home for the remainder of the day, but his aunt, Louise Scott, who was at his house, was produced as a witness and testified that on the afternoon of the 1st day of June a young man resembling the respondent, Hammond, asked the way to the shed back of the house. She heard the noise of an automobile being put in the shed and later saw the wheels of the car through a window in the

177 MICH.—27.

shed; that that evening, about 8 o'clock, some one came and took the automobile out of the shed, but she could not say positively that it was the respondent, Hammond.

Error is assigned because of the admission of her testimony, and it is claimed that her statement with reference to the young man who brought the automobile looking like Hammond was a mere opinion. She stated on her direct examination that she supposed it was Hammond, and "this young man [the respondent] looks very much like the young man." There is no question that she saw a young man and had a good opportunity of judging of his identity. As was said in *People* v. *Stanley*, 101 Mich. 93, 96 (59 N. W. 498, 499) :

"It is not necessary that witnesses shall swear to a fact with certainty. If, from their opportunity of judging of the identity, their opinion is of value, it is receivable."

We think there was enough to admit this testimony in the instant case, and the jury could give it such weight as they might think it was entitled to.

In the case of *People* v. *Gotshall*, 123 Mich. 474 (82 N. W. 274), relied upon by counsel for respondent, several witnesses testified that the man they saw near the location of the alleged crime resembled the respondent in height and size, but it does not appear that they identified him in any other way, and it further appeared that the accused was a man of average stature. The court said:

"Such testimony is merely the expression of an opinion based upon the most casual observation."

It is clearly distinguishable from the present case.

Respondent testified upon his cross-examination as follows:

"Dietsche spoke to me about this car. I don't remember everything that was said. I remember that

he mentioned about this car being stolen. What else took place there I don't remember. I don't remember any talk about an automobile tire.

"*Q.* Will you say that there wasn't any talk about a stolen automobile tire?

"*Mr. Wilkins:* I think this is entirely immaterial as to what conversation took place about matters not connected with this automobile; it lumbers up the record, and I object to it as incompetent and irrelevant.

"*Mr. Voorheis:* I understand the talk is intermingled, and I am trying to find out what was said.

"*Mr. Wilkins:* Dietsche said nothing of that kind.

"*The Court:* Take the answer. (Exception for the defendant.)

"*A.* I don't remember any talk about an automobile tire.

"*Q.* Now, didn't Dietsche say at this time that if you would return the automobile that he would not prosecute you or make any complaint for the taking of the automobile tire?

"*Mr. Wilkins:* I object to that. What Dietsche may have said is not binding at all on this defendant. Dietsche may have made lots of remarks, but that should not be allowed to prejudice this man on trial here on this charge.

"*The Court:* Take the answer. (Exception for the defendant.)

"*A.* No, I don't remember that he did. I will not say that he did not say so."

The prosecuting attorney having rested his case, the following is a portion of the record thereafter made by the people:

"Witness Dietsche, recalled for the people:

"When Hammond was at my place of business he came there in response to a request that I sent for him to go. At that time the automobile that I had reference to and that I talked about was the automobile that was out in his barn. This was either Monday or Tuesday, the 5th or 6th of June.

"*Q.* Did you or didn't you at that time say that if Hammond would return the automobile you would not prosecute him or make any complaint for the taking of the automobile tire?

"*Mr. Wilkins:* That question is objected to. There is absolutely nothing at all; there is no foundation laid for that at all. Your honor ruled out anything except what was said about the automobile.

"*The Court:* No, that may go in.

"*Mr. Wilkins:* I take an exception. There was no foundation laid for it.

"*The Court:* He has got the transcript before him. You may repeat the question and take the answer.

\*   \*   \*

"*Mr. Wilkins:* There is no foundation, and furthermore it is immaterial, incompetent and irrelevant.

"*The Court:* You may have the answer.

"*A.* Yes, I did say that.

"*Q.* That is all.

"*Mr. Wilkins:* I ask that that testimony be stricken out as incompetent and immaterial. There is no occasion for bringing in something for which there is no foundation laid; and there is no testimony here; and there has been no testimony of anything to show anything about an automobile tire stolen or alleged to have been stolen, or no charge made for anything about a stolen tire.

"*The Court:* It is let in for the purpose of showing what the defendant said when the character of this automobile that he had was called to his attention by the witness on the stand.

"*Mr. Wilkins:* What this witness said is not, certainly, to militate against the defendant. It is what the defendant said.

"*The Court:* That is competent too.

"*Mr. Wilkins:* There is nothing said about what the defendant said. It is what this witness said.

"*The Court:* That ought to be pursued for the purpose of discovering what the defendant said.

"*Mr. Wilkins:* There was no question asked as to that. It was simply remarks made by this witness; those are the only things that have been allowed to go in.

"*The Court:* Perhaps if it were pursued further it would get the defendant's response, because the defendant's response or failure to respond is what makes the remark of the witness at that time competent now.

"*Mr. Wilkins:* That is what I objected to the other day. It is simply allowing prejudicial remarks made by other persons to go in evidence against this defendant. It is not shown this defendant said anything at all.

"*The Court:* You follow it up and see what the defendant said.

"*Mr. Voorheis:* Did Hammond make any response to this statement by you?

"*A.* He said the car that I saw up there was not a stolen car. There was quite some talk on that, but that was about all the nature of it. I told him I knew that was the car that was stolen from the doctor, and he said, 'No, that is not a stolen car.' And I said at that time, 'Why,' I said, 'if that is not a stolen car,' I said, 'let's go up there and take a look at it and see it;' and he said, 'It is not there any more; the man it belonged to has taken it away.' And I told him further than that; I told him that, unless he would see that everything in that barn that was stolen was returned, why, I would go down to police headquarters and tell what I knew about the tire that I had lost and where I had found it, etc."

Cross-examination:

"That was all the talk I can remember.

.."*Mr. Wilkins:* I ask that the testimony be stricken out. There is no remark made by the defendant shown, simply remarks made by this man about things to which the defendant made no reply. It is prejudicial to him.

"*The Court:* It may go in. Exception for the defendant.

"*Mr. Wilkins:* I move to strike it out, so as to save the record.

"*The Court:* Save another exception.

"*Witness:* He told me the automobile was not his, and the man that owned it had taken it away; that is the substance of the conversation."

That part of this testimony which relates to the accusation made by the witness to the effect that the automobile was stolen had been earlier elicited from the same witness, apparently without objection. And the witness had stated that he did not know that the

automobile had been stolen but sought to convey to respondent the idea that he had such knowledge. That part of the testimony which refers to an automobile tire had not before been given.

Of the objections made to the introduction of this testimony, it is said in the brief for the people:

"In the case at bar it is uncontradicted that the defendant heard Dietsche's remarks and replied to them, saying, 'I don't remember any talk about an automobile tire;' and in reply to the second question as to whether Dietsche did not say at the same time that if Mr. Hammond would return the automobile he would not prosecute him or make any complaint for the taking of the automobile tire, Hammond said, 'No, I don't remember that he did.' Here was a proper foundation laid by these questions, the time, place, person, and the question in toto being understood by the defendant; and, when the defendant averred his lack of recollection of these questions, it became proper to impeach his testimony by calling the witness Dietsche in rebuttal. In *Smith* v. *People,* 2 Mich. 415, it was held that, if a witness neither denies nor admits having made any contradictory statements but says that he does not recollect having done so, his testimony may be impeached by proof of such statements. In *Pringle* v. *Miller,* 111 Mich. 663 [70 N. W. 345], it is held that when a witness was asked for the purpose of impeachment if he did not make certain statements, and replies that he has no recollection of making them, then the party asking the questions might call other witnesses to prove that they were made.

"It should also be remembered that the question asked of the defendant on cross-examination was, 'Now, didn't Dietsche say at that time that if you would return the automobile he wouldn't prosecute you or make any complaint for the taking of the automobile tire?' The defendant denied having any recollection of this question being asked him by Dietsche, and on rebuttal Dietsche testified that he did ask the defendant the question referred to, and further testified as to the defendant's reply thereto, which was, 'He [the defendant] said the car that I saw up there was not a stolen car.' Dietsche said

further that 'I told him [the defendant] I knew that was the car that was stolen from the doctor and he said, "No, that is not a stolen car." '

"Now it is apparent that, if the defendant admitted to the witness Dietsche that the car was a stolen car, there could be no contention that such admission was not receivable in evidence. It was necessary to ask Dietsche the question in order to ascertain the defendant's reply, and when he testified that the defendant's reply was, 'No, that is not a stolen car,' that was all there was to it. There could be no prejudice committed against the defendant by letting in this testimony, because the defendant denied the accusation, and the witness Dietsche admitted that he denied it; and, as there was no other testimony on this point, there could be no doubt created in the minds of the jury because of this particular bit of testimony. It should be remembered that the entire conversation between Dietsche and Hammond, whether pertaining to an automobile tire or to an automobile, was so interwoven that it was practically impossible to ask questions of Dietsche or for Dietsche to make reply thereto without referring to both transactions.

"Counsel for the defendant, under the same heading, make further objection that the testimony of this conversation between Dietsche and Hammond tended to show another and distinct larceny, namely, that of stealing an automobile tire. If the defendant had admitted that there was a talk about a stolen automobile tire, and also that Dietsche had told him that if he [the defendant] would return the automobile he [Dietsche] would not prosecute him for the taking of the automobile tire, it is hard to see how such reply would have had any tendency to show that he had stolen an automobile tire. The questions were simply as to the conversation had between Dietsche and Hammond relative to the automobile; and, in order to bring out the entire conversation, it was necessary that the question of the automobile tire should also be mentioned; but the defendant certainly could not have been prejudiced before the jury by this fact, because Dietsche said that Hammond replied, stating simply that the automobile in question was not stolen. No further questions along this line were asked of

the defendant, and his denial closed the incident. Dietsche was not asked as to whether or not Hammond had stolen an automobile tire, and it was not even intimated that such was the case.

Admitting, however, for the sake of argument, that the questions asked of Dietsche were such as having a tendency to show the commission of a separate and distinct crime by Hammond, inasmuch as the automobile which had been taken from Dr. Brady was found in the possession of the defendant, and his defense consisted in an effort to show that the car had come into his possession innocently and without any criminal intent on his part, it would seem that under the well-settled rule of law it would have been proper to have shown the commission of a crime of a similar kind and character for the purpose of showing the intent of the defendant in the case at bar."

The prosecution did not undertake to prove the commission of a similar offense, and it did not prove that respondent had stolen an automobile tire. It was entirely immaterial to the case for the people to prove that one or more persons had accused respondent of having stolen the automobile, unless in connection with such accusations respondent admitted that he had stolen it or knew that it was stolen or failed to make any reply.

But it is very suggestive and is prejudicial to a respondent charged with larceny when one or more persons are permitted to testify, in substance and effect, that they suspected respondent was a thief and so told him, even if they also testify that he denied the accusation. It is not difficult to imagine what would be the effect upon a jury of the testimony of five or six reputable men to the effect that they accused the respondent of stealing or of receiving stolen property, knowing it to have been stolen. The declarations of the accused, made in reply to the accusations, that he did not steal the property cannot be supposed to cure the mischief.

That respondent had testified that he could not re-

member a portion of the alleged conversation afforded no reason for presenting the conversation to the jury. It would have been quite as proper to ask respondent if on some other occasion and with respect to some other property he had not been accused as a thief and, if he answered that he did not remember it, to confront him and the jury with his alleged accuser. Undoubtedly, whatever affects the credit of a witness is material, and there should be as little restriction as possible upon a course of procedure which will disprove a false witness. But the failure of a witness to remember immaterial facts does not open the door to testimony that the facts existed.

A witness, Fred Andrews, testified for respondent. Recalled by the prosecution for further cross-examination, he testified:

"I worked for the Michigan Central three or four times, about two years and a half or three years, all told, something like that. I would not say whether I worked for the Michigan Central in the year 1906. I don't just remember the year I did start. I would not just say how long it was distributed over. I worked in the roundhouse and I used to switch there and as a brakeman. I would not say how old I was when I started in. When I worked for the Michigan Central I always went by the name of Fred Andrews. My middle name is John—Frederick John Andrews —but probably I didn't put in the John. I do not know just what I did put down in the application. I might have put Frederick, and I might have put Frederick John. I do not know; I did not use any other names.

"*Q.* Isn't it a fact that you went to work for the Michigan Central on the 24th day of January, 1906; that you filed your application on the 15th day of January, 1906, and that you worked to March 10, 1906, and that was the last time and the only time that you worked for the Michigan Central?    *    *    *

"*A.* No, sir.    *    *    *

"*Q.* That is not a fact, then?

"*A.* No, sir; I worked three or four—I cannot say whether it was three or four times. During that

time, between the dates given, I would not say that I was or was not working for them. I do not know; but I worked there anyway. I do not just remember the dates that I did work there. Besides the time that I worked in the roundhouse, I got a job braking for the Michigan Central and I got a job switching after that. Some of the time I was on a run out from Detroit to Jackson and other places, when I was braking. Mr. Comstock did not hire me when I got switching. He hired me for braking. I could not just say how long I worked for the Michigan Central. I do not remember; it might have been a year and a half; might have been a year; I would not say."

Thereupon the prosecution called a witness who testified that he was timekeeper for the Michigan Central Railroad from December 8, 1908, to the date of the trial, and that it was his duty to keep time for all trainmen and yardmen. He was asked to state the custom of his department relative to the records made of applications of those desiring employment. He answered:

"When a man desires employment, he goes to the trainmaster, and if the trainmaster wants to hire him he tells his clerk to hire this gentleman, and he makes out an application, a copy of which you have there, and then when an application is made out the man that hires him keeps a copy of it and sends the man to be examined. * * * The record of these applications is kept in the impression book, of which I have charge.

"Q. I show you this book which is marked 'Employment, February 15, 1905, to January 21, 1906,' and ask you if that is the book kept by you of such applications? * * *

"A. They are copies.

"Q. Those purport to be copies of certain writings?

"A. Yes, sir. * * *

"Q. I will ask you as to what record you find in that book relative to any application as made by Fred Andrews, Frederick Andrews or Frederick John Andrews, during the time covered by that book? *

"*A.* This book shows that Frederick John Andrews was hired as a freight brakeman on January 15, 1906.   *   *   *

"*Q.* Do you find any record of any other application made by Mr. Andrews for employment during the time covered by this book?   *   *   *

"*A.* There is no other records of this man in this book. (The book is considered marked Exhibit A.) I have made no search of the same records from the time of the expiration of this record down to the present time. The records at the time when a man goes to work and when he ceases working for the railroad in my department are kept in the time book, which is this book marked 'Time Book,' which covers the period November, 1905, to July, 1907, and which is also kept in my office.

"*Q.* I will ask you to refer to that book and tell the court and jury what this shows relative to the employment of Andrews during the time covered by the book.   *   *   *

"*A.* The first trip Mr. Andrews made was on January 21, 1906, to Toledo.   *   *   * The last trip he made was on the 10th day of March, 1906, coming from Jackson to Detroit. And the book shows that he got a time check some time in March which paid him for the full time worked in March. I have looked half-way through this book, but I could not find any other record or records of his working for the Michigan Central to October, 1906.

"*The Court:* Where did you get this book?

"*A.* In the superintendent of terminals' office. It is part of the records of our office, and that is where I got it. My office is timekeeper. The office out of which I took this is the superintendent of terminals. That is the only record of the time the men put in during that period. The record that our company keeps."

On cross-examination he testified:

"I am not timekeeper for the whole Michigan Central system, just for Bay City, Toledo division. The time of the men running to just Toledo and Bay City is kept in these books. I know as to how the books were kept prior to the time I came in there. I was assistant to the timekeeper. I first entered the em-

ploy of the Michigan Central Railroad February 8, 1905. I was car checker at that time and became assistant timekeeper in July, 1907. Prior to that time I had nothing to do with keeping any records in the office of the superintendent of terminals; anything prior to that time I know nothing of. As to matters I have testified to from July, 1905, down to the time I went in there in 1907, they are book records, and I do not know how the books were kept at that time, except as the books show themselves. I do not know whether they are correct. I do not know whether at those times a record of all the men running out of Detroit was kept in the office of the superintendent of terminals or not, prior to the time I went in there. From 1905, down to 1907, I cannot tell whether those records contain a complete record or those books a complete record of all the men running out on Jackson and Toledo division."

This testimony was received over repeated objections to its competency and materiality, and motions to strike it out were denied. Of it, it is said in the brief for the people:

"It is therefore respectfully submitted that in view of the fact that witness Andrews was impeached, and he shown to be a man unworthy of credit by reason of his denials of remembrance of three convictions of offenses under the laws of this State, which offenses it was shown positively by the records of the police court of the city of Detroit had been committed by him, it was impossible to further discredit the said witness Andrews before the jury or to render his testimony less worthy of belief, and that the allowing of the testimony of witness Miller, contradicting statements of Andrews, relating to his employment with the Michigan Central Railroad Company, could not prejudice the defendant in any way whatsoever, and that the permitting of such testimony does not constitute reversible error; this being further particularly true in view of the clear and explicit instructions of the trial judge upon the matter, as above set forth."

We know of no rule of evidence which sustains the

ruling that his recollection (or his truthfulness) could be contradicted by a private record, the contents of which were not shown by any witness to be a record of facts. It was hearsay testimony purely.

Requests were made to the court to charge the jury that, in order to warrant a verdict of guilty, each and every one of the jury must be convinced beyond a reasonable doubt of the defendant's guilt. The charge of the court as given was as follows:

"This, gentlemen of the jury, is largely a case of circumstantial evidence. You are to take all the testimony in the case, all the various circumstances which have been testified to here by the various witnesses, and ask yourselves whether or not they satisfy you beyond a reasonable doubt that the defendant at the bar either himself or by or through another joined with him in an illegal agreement to commit this crime, the commission of which the defendant in some way aided, took and carried away this car, the personal property of Dr. Brady, without any color of right for so doing, and with felonious design to permanently deprive Dr. Brady of the possession of it. * * *

"Now, to recapitulate finally, gentlemen of the jury: Are you satisfied beyond a reasonable doubt that the defendant at the bar himself took and carried away the personal property of Dr. Brady, namely, this automobile, without any color of right for so doing and with the felonious design to permanently deprive him of the possession of it? Then he is guilty, if he did. If you are not satisfied of that, are you satisfied beyond a reasonable doubt that he, by or through another joined with him through an illegal conspiracy to commit this particular offense, did aid in the commission of it by the other and that other took and carried away this personal property, this automobile of Dr. Brady, without any color of right for so doing and with the felonious design to permanently deprive him of the possession of it? Then the defendant is guilty, because, if he entered into an illegal agreement with some other person to commit a crime and in any way aided in the consum-

mation of that illegal agreement, what one did is the act of both."

The case of *People* v. *Hare,* 57 Mich. 505 (24 N. W. 843), is called to our attention. In that case, as was said in *People* v. *Curtis,* 97 Mich. 489, 490 (56 N. W. 925, 926) :

"It does not appear that the court instructed the jury at all upon the subject, but, on the contrary, said that it was not the duty of the court to charge individual members."

As stated in the opinion last referred to, it must be presumed that jurors are possessed of common sense. A reading of the portions of the charge of the trial court above quoted convinces us that it could not have been misunderstood by the jury and sufficiently apprises them of their rights and duties.

A request was made to charge the jury as follows:

"Now the respondent has taken the stand and testified in his own behalf, and I charge you that his testimony is to be tested the same as that of other witnesses, and that, if rational, natural, and consistent, it may outweigh the testimony of all other witnesses."

The request was refused and error is assigned thereon. We cannot escape the conclusion that it was error not to give this request or cover it in the general charge, under authority of *People* v. *Mc-Arron,* 121 Mich. 1 (79 N. W. 944). Our attention is challenged by the prosecuting attorney to the dissenting opinion of Mr. Justice GRANT in that case, when he said at page 44 of 121 Mich. (79 N. W. 959) :

"The fourth request was sufficiently covered by the general charge in regard to the credibility of witnesses. I see no reason why the respondent should have been singled out, and attention especially called to his testimony. We are cited to no case which holds that to be essential. The language of the request would apply equally to any other witness. Where conviction depends mainly upon one witness for the people, such an instruction in regard to his testimony would

be a correct statement of the law, but such an instruction would sound strange when so applied. The jury were instructed that the weight of evidence was for them entirely. Every juror of average intelligence knows this, without being so instructed, and also knows that he can believe or disbelieve any witness. When one on trial for a crime becomes a witness and is, by the instruction of the court, placed on the same basis as other witnesses, he has received all the protection in this regard which the law gives him. The same rules of evidence apply to him as to others, and the practice of calling special attention to one witness has been condemned."

It will be noted that even this opinion was based upon the ground that the general charge as to the credibility of witnesses sufficiently covered the request. No instructions were given in the instant case as to the weight to be given to the testimony of witnesses generally.

The other errors complained of relate to the charge of the court; and, while the learned judge did not follow the language of the written requests, he covered them sufficiently in his general charge. *People v. Swartz,* 118 Mich. 292 (76 N. W. 491) ; *People v. Quimby,* 134 Mich. 625 (96 N. W. 1061).

For the reasons stated, the conviction is set aside and a new trial granted. The respondent will be delivered to the custody of the sheriff of Wayne county.

STEERE, C. J., and MOORE, MCALVAY, BROOKE, STONE, OSTRANDER, and BIRD, JJ., concurred.